# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #043

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **1st day of September, 2015**, are as follows:

**BY CLARK, J.**:

2013-KA-1631      STATE OF LOUISIANA v. LAMONDRE TUCKER (Parish of Caddo)(First Degree Murder)

Retired Judge Burrell J. Carter, assigned as Justice ad hoc, sitting for Crichton, J., recused.

For the reasons assigned herein, the defendant's conviction and death sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La. C.Cr.P. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana Public Defender Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:178; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
AFFIRMED

09/01/15

SUPREME COURT OF LOUISIANA

NO. 2013-KA-1631

STATE OF LOUISIANA

VERSUS

LAMONDRE TUCKER

ON APPEAL
FROM THE FIRST JUDICIAL DISTRICT COURT
FOR THE PARISH OF CADDO


CLARK, Justice[*]

This is a direct appeal under La. Const. art. V, § 5(D) by the defendant Lamondre Tucker.[1] In November 2008, a Caddo Parish grand jury indicted the defendant for the first degree murder of Tavia Sills, in violation of La. R.S. 14:30. After a trial, the jury found the defendant guilty as charged. At the conclusion of the penalty phase of the trial, the jury unanimously returned a verdict of death, finding the aggravating circumstances that: (1) the defendant was engaged in the perpetration or attempted perpetration of second degree kidnaping; and (2) the defendant knowingly created a risk of death or great bodily harm to more than one person. The trial court sentenced the defendant to death in accordance with the jury's determination. Defendant now appeals his conviction and sentence, raising 55 assignments of error, variously combined into 21 arguments.[2] After a thorough review of the law and the evidence, we find no merit in any of the assignments of error. Therefore, we affirm the defendant's conviction and sentence.

---

[*] Retired Judge Burrell J. Carter, assigned as Justice ad hoc, sitting for Crichton, J., recused.

[1] Defendant's birth certificate indicates his name is Lamondre Markes Tucker Metcalf, and lists his father as Alonzo Vantroy Metcalf and his mother as Alicia Ann Tucker. Alonzo Metcalf is deceased and defendant uses his mother's surname.

[2] The assignments of error not discussed in the body of this opinion are addressed in an unpublished appendix comprising a part of the official record in this case.

# FACTS AND PROCEDURAL HISTORY

In September 2008, Tavia Sills was nearly five months pregnant. A few weeks earlier, she had informed 18-year-old Lamondre Tucker that she believed he was the father of her unborn child. On September 9, 2008, Tucker picked Tavia up at the home of her mother, Vickie Britton. Tucker claimed that his sister, Alexis Metcalf, had asked to meet Tavia after learning of the pregnancy. Before leaving, Tavia demonstrated some trepidation; she asked her mother to pray with her and then gave her defendant's phone number.

A few hours later Tucker returned without Tavia and informed Mrs. Britton that, at Tavia's request, he had dropped her off at the apartment of her older sister, Toquilla Sills. Mrs. Britton became alarmed because she knew her daughter Toquilla was not at home, as she had been hospitalized due to complications from her own pregnancy. Mrs. Britton contacted Shreveport police.

Sergeant John Youngblood investigated the missing person report. He spoke with Tucker at his high school, Booker T. Washington. Tucker told him that he had dropped Tavia off at the Prince Village Apartments in Shreveport. Sergeant Youngblood obtained surveillance videos from the apartment complex and discovered that Tucker, Tucker's car and Tavia did not appear in any of the videos.

On September 12, 2008, a couple fishing by a secluded pond near Legardy Street in Shreveport discovered the decomposing body of Tavia Sills floating in the water. Tavia had been shot three times. Two shots perforated soft tissue at the base of her neck and her upper arm. The fatal, penetrating shot was fired into her back, perforated her lung, and fractured a rib.

Tucker accompanied Detective Rod Demery, the lead homicide investigator, and Sergeant Youngblood to the police station the evening of September 12, 2008. Tucker was arrested, *Mirandized*, and interviewed around midnight. In an audio-

recorded interview, Tucker claimed he took Tavia to meet his sister, who was not at home, so he dropped her off at the Prince Village Apartments. Detective Demery informed Tucker that the surveillance video proved that he was lying and the detective indicated that he was turning off the recorder. The detective, however, continued to record the interview. Tucker then explained that he dropped Tavia off on the corner near the Prince Village Apartments at her request (outside the range of the surveillance video). Defendant was transported to jail.

Late the next morning, after attending the autopsy, Detective Demery interviewed Tucker at the jail. The detective allowed Tucker to call and speak with his mother. Tucker then admitted that he had taken Tavia to the pond where her body was found. Near the pond, Tucker claimed he found a tackle box containing a pistol. Tucker claimed that when he held the pistol up it accidentally discharged, twice, hitting Tavia. Tucker said he then ran away and discarded the gun in a drainage canal near Linear Street just off of Dr. Martin Luther King Drive. Tucker agreed to accompany the detective to show him where he discarded the gun. A diver recovered a CZ .40 caliber semi-automatic pistol from the drainage canal. A firearms examiner later determined that three .40 caliber cartridge cases found by the pond were ejected when this pistol was fired. The firearms examiner was unable to determine, however, that the fatal bullet recovered during the autopsy was fired by the pistol (although it had the same general class characteristics).

Tucker, after being interviewed repeatedly throughout the day on September 13, 2008, eventually abandoned the tackle box story and admitted he had obtained the pistol from Marcus Taylor a few days before the shooting.[3] Tucker said Taylor

---

[3] Taylor was indicted for second degree murder, tried, found guilty of manslaughter, and sentenced to 30 years imprisonment at hard labor. The conviction and sentence were affirmed on appeal. *State v. Taylor*, 49,467 (La. App. 2 Cir. 1/14/15), 161 So.3d 963. When interviewed by police, Taylor admitted that he gave the pistol to Tucker but claimed he did not believe he would use it. Taylor said Tucker shot Tavia Sills and began pouring lighter fluid on her. Tavia jumped into the pond to avoid being set on fire. Tucker then shot her again. Taylor claimed he then

had accompanied them to the pond. Tucker claimed he offered to teach Tavia to shoot and he handed her the pistol. He said he tried to grab it back from her because she wasn't holding it in a safe manner, which is when it discharged twice accidentally. Tavia was shot and fell to the ground. Taylor suggested they call the police but Tucker was frightened and pushed Tavia, who was still alive, into the pond. Tucker said he then shot her again, deliberately this time to be certain she was dead, and Taylor used a branch to push her farther out into the water. Although the third shot would have been imminently fatal, the coroner could not exclude the possibility that Tavia had drowned.

During the course of the investigation, several witnesses were interviewed. Alexis Metcalf, Tucker's sister, confirmed that Tucker did not bring Tavia to meet her on September 9, 2008. Tavia's sister, Toquilla, confirmed that she was at the hospital on that date and said that Tavia in fact had visited her there earlier that day. Tamara Bates, the mother of Tucker's three-year-old son, told police she and Tucker had argued about the status of their relationship when she learned of Tavia's pregnancy just a few days before Tavia was reported missing. Chasmine Hamilton, Tucker's close friend, said Tucker confided in her when he learned Tavia was pregnant and expressed the desire to beat Tavia to cause a miscarriage. Charles Wilson, Tucker's friend, said that Tucker had asked him on September 11, 2008, to claim he saw him drop Tavia off at the Prince Village Apartments. Glen Taylor, another friend of Tucker, told police that Tucker told him that he and Marcus Taylor pushed Tavia into the pond, Tucker shot her, Tavia asked Tucker what he was going to tell his mother, and then Tucker shot her again. Catherine Golston, who lives near the pond, said she heard a young woman screaming nearby and looked and saw that she was pregnant. According to Golston, the young woman was afraid of the cattle that pastured along the path to the pond. Golston

reluctantly helped Tucker push her body out farther into the pond with a branch.

also heard Tucker's voice, which she recognized, trying to calm the young woman. Later she heard two gunshots and then a third.

Subsequent DNA testing proved that Tucker was not the father of Tavia's unborn child. Expert witnesses estimated that the male fetus was 19 weeks old, healthy, and barring unforeseen complications, believed Tavia would have carried him to full term and given birth to a healthy infant. The experts indicated that a 19-week-old fetus is not viable outside of the womb.

Tucker was indicted for first degree murder. By bill of particulars, the state clarified that Tucker committed first degree murder by killing Tavia Sills while engaged in the perpetration of a second degree kidnapping and when he had the specific intent to kill or inflict great bodily harm upon more than one person. Tucker filed a motion to suppress his statements, in which he contended they were involuntarily and unknowingly made, as well as made after he invoked his right to remain silent and to the assistance of counsel. The motion was denied after an evidentiary hearing held on March 10, 2010. At the hearing, the state presented the testimony of Detective Demery and Sergeant Youngblood that Tucker voluntarily accompanied them to police headquarters, was *Mirandized*, signed a rights waiver, and voluntarily gave a series of increasingly incriminating statements after initially denying any involvement. The defense presented the testimony of Tucker's grandmother, Ora Ellis, Tucker's mother, Alicia Tucker, and Tucker. According to Alicia Tucker and her son, Detective Demery promised that if Tucker would confess to an accidental shooting then the charge would be reduced to manslaughter and her impounded car would be returned to her.

Jury selection began on March 14, 2011, and was completed on March 19, 2011. Six panels of approximately 16 prospective jurors each were examined. Eight prospective jurors were excluded by joint agreement. For each panel, death

5

qualification preceded general voir dire. During death qualification, the state challenged 35 prospective jurors for cause, of which 33 were granted, and the defense challenged 12 prospective jurors for cause, of which 6 were granted.[4] During general voir dire, the state made three cause challenges, of which two were granted without objection by the defense, and the defense made 12 cause challenges, of which 8 were granted (6 without objection by the state). Nineteen peremptory challenges were exercised including two backstrikes.[5] A jury of 12 with 2 alternates was selected.[6]

During jury selection three significant events occurred. First, the defense filed motions to quash on the basis that the state had not given notice that it was seeking the death penalty. Specifically, the defense noted the state had not filed a notice of intent to seek the death penalty and argued that although the state had responded with particulars identifying that it was proceeding under La. R.S. 14:30(A)(1) and (3) regarding the offense, it had not clarified that it would seek a capital penalty in accordance with La. R.S. 14:30(C)(1). After these motions were denied, the defense sought supervisory review and the court of appeal denied writs on the showing made.[7] Second, after the state challenged prospective juror Richard Clark (a black male) based on his opposition to the death penalty, the

---

[4] The defense objected to only 5 of the state's 35 cause challenges during death qualification. The state objected to 8 of the defense's 12 cause challenges during death qualification.

[5] Dawn McCutcheon (white female), Micah Walker (white female) (backstrike), Helen Colbert (white female), Brian Godfrey (black male), Lisa Mills (black female), Brandy Harvey (black female), Philip Alford (white male), John Forehand (white male), Rachal Foreman (black female), Candice Sweat (white female), Joy Birch (white female), Patricia Johnson (white female), Alan Ogden (while male), Robert Litton (white male), Alvin Coco (black male), Robert Rogers (white male), Clarence Hicks (black male) (backstrike), Mary Nordberg (white female), William Ricks (white male). The record does not clearly indicate which side exercised each peremptory challenge. Of these 19 prospective jurors removed by peremptory challenge, 7 were unsuccessfully challenged for cause earlier by the defense (Forehand, Birch, Johnson, Litton, Coco, Rogers, Hicks), and 2 were unsuccessfully challenged for cause earlier by the state (Colbert, Ricks).

[6] Mary Irvin (white female, later chosen to be foreperson), Madge Berry (white female), Linda Morgan (white female), Lillie Richmond (black female), Edwin Sutton (white male), Abby Beazley (white female), Carol Gray (white female), Anita Spencer (black female), Ginger Blair (white female), Lisa Devincent (white female), Amy Lawler (white female), Cristin Davis (white male), Mark Huffty (white male, alternate), and Kristen Hiers (white female, alternate).

[7] *State v. Tucker*, 46,510 (La. App. 2 Cir. 3/18/11) (unpub'd).

6

defense objected that the death qualification process was disproportionately excluding blacks from the jury.[8] However, the defense emphasized that it was neither asserting a *Batson*[9] challenge nor accusing the prosecutors of exercising challenges on the basis of race. Third, after prospective juror Latisha Griffin changed her views on the death penalty overnight, a brief recess followed after which defense counsel informed the court they believed someone had spoken with this prospective juror and persuaded her to change her answers. Griffin was examined and admitted that she had received a three-way telephone call the night before in which Tucker urged her to change her answers to questions about the death penalty. Defense counsel then moved to withdraw based on a conflict of interest resulting from being witnesses to jury tampering by their client; the trial court denied the motion.

Opening statements commenced on March 20, 2011. The state described how it believed the crime occurred, summarized the evidence it would present, and explained how that evidence established the elements of the crime. The defense acknowledged that a tragedy had occurred and expressed its sympathy, reminded the jury of the state's burden of proof, and asked the jury to keep an open mind until they heard all of the evidence. The state presented the testimony of 22 witnesses, including three members of the victim's family, four friends or family of Tucker, seven law enforcement officers, two obstetricians, a forensic DNA analyst, a firearms examiner, and a forensic pathologist.[10] The defense rested without presenting any testimony or evidence.

In closing, the state summarized the elements of the offense and the evidence proving them; emphasized that Tavia Sills and her unborn child were

---

[8] The defense also objected to the state's cause challenge to prospective juror Melvin Richardson on the same basis.

[9] *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

[10] The defense only briefly cross-examined 6 of the state's witnesses and did not cross-examine 15 witnesses at all.

both alive and healthy when last seen with Tucker; argued Tucker's specific intent could be inferred from his admission that he fired a final shot to ensure the victim died; noted that Tucker's story changed several times during police interviews; argued Tucker killed Tavia Sills to save his relationship with Tamara Bates; and emphasized Tucker has never shown remorse. The defense's brief closing remarks follow:

> Good evening, ladies and gentlemen. I will not belabor the evidence in this case, ladies and gentlemen, simply because the facts are not in dispute. What is in dispute is the legal analysis. What we submit to you is that Lamondre is guilty of the second degree murder of Ms. Tavia Sills and the feticide of her unborn child; that is, the killing of the unborn child with specific intent to kill or inflict great bodily harm. Thank you.

R.18 at 3849-50. In rebuttal, the state responded that the crime is not a second degree murder but rather a cold-blooded killing. The state described the crime to the jury, emphasizing the fear Tavia would have experienced. During the state's rebuttal, Tucker created a disturbance and was removed from court at the request of the defense.[11] The state then continued its closing remarks, emphasizing Tucker could have sought medical attention but instead chose to push the victim into the water and shoot her again. Thus, the state argued the crime was too cold-blooded to be a second degree murder.

---

[11] Defense counsel asked that his client be removed:
> Mr Goins: Your Honor, given the circumstances, we make a request Mr. Tucker be removed for the remainder.
> The Court: and that's the request of defense counsel?
> Mr. Goins: Yes, Your Honor, it is.
> The Court: Court would accede to that request.
> Mr. Goins: And at Mr. Tucker's own request.
> The Court: And at his request.
> Mr. Cox: Your Honor, I'd just like to make it clear for the record, because the defendant does have a right to be present at all proceedings, that this is something the accused has requested.
> The Court: Anything else, Mr. Cox?
> Mr. Cox: No. I just wanted to make that sure for the record.
> The Court: That's why I asked was that a request of defense counsel. And defense counsel indicated yes, along with the request of defendant.
> Mr. Goins: Correct.

R.18 at 3854-55.

On March 22, 2011, the jury found defendant guilty as charged of first degree murder. The penalty phase commenced on March 23, 2011. In its opening remarks, the state asked the jury to consider the circumstances of the offense and Tucker's character and propensities, and the state summarized the evidence presented at trial with an emphasis on defendant's cold-heartedness. The defense informed the jury that, rather than discussing the crime, it would tell the jury about the other 18 years of Tucker's life, which included an unstable home environment with abusive men, as well as his efforts to turn his life around through football.

The state presented three victim-impact witnesses: Vickie Britton (the victim's mother), Toquilla Sills (the victim's older sister), and Lashun Gipson (the victim's godmother).[12] Mrs. Britton described her daughter as a student studying at Southern University to become a phlebotomist who was excited about her pregnancy and was well-loved by the community. She testified that she was profoundly affected by her daughter's death. Toquilla Sills described how the victim helped care for her children despite working two jobs and attending school. She said they were both looking forward to raising their children together closely. Ms. Sills described experiencing drastic weight loss following the loss of her sister and what would have been her first nephew. Lashun Gipson described how she first met the victim and how closely they bonded. Ms. Gipson described the victim as being like a daughter to her.

The defense presented six witnesses: Alicia Tucker (Tucker's mother), Alexis Metcalf (Tucker's older sister), Danny Blackman (who was at one time involved with Tucker's mother), Kevin Richardson (Tucker's cousin), Rev. Rickey Moore (who employed Tucker on occasion), and Kalan Washington (Tucker's former teacher, football coach, and mentor). Alicia Tucker described how she had a series of tumultuous relationships with abusive men and drug dealers, and

---

[12] The defense did not cross-examine these witnesses.

claimed the family was displaced so often that she could not recall the number of residences Tucker lived in or schools he attended. During her testimony, pictures from her family scrapbook were projected for the jury. Of particular note during her testimony (as is discussed below), is that when defense counsel asked her the opened ended question "What happened at Booker T. Washington?", she responded that her son had been accused of rape after engaging in consensual sex with a younger girl.[13] Alexis Metcalf testified that Tucker treated her sons and his own son well. Danny Blackman testified he considered Tucker to be like a stepson. Blackman said Tucker loved horses, played football, and never gave him any trouble. Kevin Richardson described Tucker as an easy going person who enjoyed playing with children. Rev. Rickey Moore testified that he hired Tucker to help care for his horses and to teach his son to ride. Kalan Washington said Tucker, who participated in his youth mentoring program, was a smart player who could have gone on to play college football. According to Washington, Tucker would stand up for other children and became frustrated when he believed something was unfair.

The state vigorously cross-examined the defense witnesses. The state elicited that defendant, at age 13, was accused of shooting a neighboring child with a BB gun; was repeatedly disciplined at school for fighting; and pleaded guilty to misdemeanor carnal knowledge after being accused of rape. The state asked Blackman, Richardson, and Washington if they were familiar with the nature of the crime Tucker was convicted of committing. The state showed these witnesses two crime scene photos and asked whether it would change their opinion of Tucker's character if he admitted he had committed the crime. The defense objected during the testimony of two of the witnesses and moved for a mistrial. The defense

---

[13]According to the defense, counsel intended to elicit information about Tucker's participation in football. Defense counsel attributes her response to the breakdown in communication that followed the jury tampering incident.

objected to the state giving Blackman details of the crime of which he was not aware. The trial court sustained the objection and admonished the state not to testify. The defense also objected to state's badgering of Washington (who provided several rambling and non-responsive answers during the state's cross-examination). The trial court denied the motions for mistrial.

In closing, the state depicted defendant as a cold-blooded murderer who callously destroyed a family and tried to get his friends to cover for him. The state noted his poor school disciplinary record and that he was previously convicted of misdemeanor carnal knowledge of a juvenile. The state characterized the defense mitigation case as establishing only that Tucker likes horses and football. The state argued Tucker killed the victim believing he could then simply go off to college to play football. Regarding Alicia Tucker's scrapbook, the state noted that the victim's family will not have the opportunity to make a comparable one. The state claimed that Tucker has never expressed any remorse.

The defense, in closing, asked the jury to spare defendant's life, emphasizing that Tucker was an immature high school teenager who acted uncharacteristically under the pressure of repeating his last year of high school and his complicated relationships with Tamara Bates and the victim. The defense dismissed the state's cross examination as involving minor things that many children engage in, such as poor behavior at school and misuse of BB guns. Regarding remorse, the defense argued that children typically show no remorse and suggested that lack of remorse might be considered a mental defect, *i.e.*, a mitigating circumstance. The defense pleaded for life in prison so that Tucker would have the opportunity to develop remorse. Noting that defendant has a son, the defense asked the jury to not act in anger and do something they would regret later.

The state responded in rebuttal that defendant's repeated expulsions and

suspensions suggest he lacks the capacity to learn from his mistakes or develop remorse. Although the defense characterized Tucker as lacking mental capacity, the state noted that his coach had described him as an intelligent football player with college potential. Although the defense characterized Tucker as impulsive, the state countered that the crime was coldly planned. In conclusion, the state contended that death was the only penalty proportionate to the harm inflicted on the victim's family.

At the conclusion of the penalty phase, the jury returned a verdict of death. Shortly thereafter, the Louisiana Capital Assistance Center enrolled to represent Tucker on appeal and filed numerous motions, culminating in an omnibus motion for new trial.[14] On June 29, 2011, the trial court denied the omnibus motion and sentenced Tucker to death in accordance with the jury's determination.

Tucker subsequently filed a motion to reconsider sentence in which he contended that his immaturity in conjunction with his diminished capacity renders him ineligible for the death penalty because he was just five months past his eighteenth birthday at the time of the crime and he has a full scale IQ of 74. He also filed a motion for new trial, alleging that the victim's mother had forgiven him and found peace; he was not the shooter; and he had evidence rebutting the state's negative depiction of him in the penalty phase. Following the trial court's denial of these motions, defendant appealed directly to this Court.

## LAW AND ANALYSIS

### Primary Claims

---

[14] The omnibus motion is substantially similar to defendant's appeal brief. Among the 18 claims presented, are the following: (1) subsequent psychological testing of Tucker and his educational records suggest his poor intellectual functioning would cause him to interpret Detective Demery's statements as promises, and therefore Tucker's statements should be suppressed; (2) a subsequent study of six capital trials in Caddo Parish shows that blacks are systematically excluded from serving on juries by the death qualification process; (3) the state exercised peremptory challenges on the basis of race in violation of *Batson*; and (4) the jury tampering incident resulted in a conflict of interest and jeopardized communication among defense counsel and Tucker and his family.

*Sufficiency of the Evidence*

**Whether intentionally shooting a pregnant woman constitutes intent to kill or harm more than one person.**

Defendant contends he is the first person convicted of first degree murder under La. R.S. 14:30(A)(3) (intent to kill or harm more than one person) for killing a pregnant woman and her unborn child. He argues that feticide does not elevate second degree murder to a capital offense under La. R.S. 14:30, as written, and, therefore, the evidence does not support a conviction for first degree murder.

Defendant notes that this Court determined in *State v. Gyles*, 313 So.2d 799, 801 (La. 1975) that a "defendant's conduct of striking the pregnant woman and causing the stillbirth of the child is not punishable as a 'murder' under the definition of that crime in the Louisiana statutes and those of other jurisdictions." He also notes that this Court again found that feticide is not homicide despite the legislative amendment to La. R.S. 14:2(7) that expanded the definition of person to include the unborn. *State v. Brown*, 378 So.2d 916 (La. 1979). Defendant contends that, despite this jurisprudential context and subsequent legislative action establishing several degrees of feticide, the legislature has not indicated that it intends La. R.S. 14:30(A)(3) and La. C.Cr.P. art. 905.4(4) to encompass the unborn. Thus, defendant argues, lenity requires interpreting any ambiguity in these provisions in his favor. Defendant also contends the trial court erroneously instructed the jury by refusing to inform it that a pregnant woman and her unborn child cannot be considered more than one person for purposes of La. R.S. 14:30(A)(3).

In *Kennedy v. Louisiana*, 554 U.S. 407, 421, 128 S.Ct. 2641, 2650-51, 171 L.Ed.2d 525 (2008), the United States Supreme Court determined that "a death sentence for one who raped but did not kill a child, and who did not intend to assist another in killing the child, is unconstitutional under the Eighth and Fourteenth

Amendments." In making that determination, the court noted that "the death penalty is not invariably unconstitutional". *Id.*, 554 U.S. at 420, 128 S.Ct. at 2650 (citing *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). Rather, the court noted that "capital punishment must be limited to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution." *Id.* (quoting *Roper v. Simmons*, 543 U.S. 551, 568, 125 S.Ct. 1183, 1194, 161 L.Ed.2d 1 (2005) and *Atkins v. Virginia*, 536 U.S. 304, 319, 122 S.Ct. 2242, 2251 153 L.Ed.2d 335 (2002)) (internal quotes omitted).

We have found no constitutional impediment to including offenders who intentionally kill women they know are pregnant in that narrow category.[15] In fact, of the 32 states that at present authorize capital punishment, seven provide that the intentional killing of a pregnant woman is an aggravating factor that may justify a death sentence. Ariz. Rev. Stat. § 13-751(F)(9) ("the murdered person was under fifteen years of age, was an unborn child in the womb at any stage of its development or was seventy years of age or older"); Colo. Rev. Stat. Ann. § 18-1.3-1201(5)(q) ("[t]he victim was a pregnant woman, and the defendant intentionally killed the victim, knowing she was pregnant"); Del. Code Ann. tit. 11, § 4209(e)(1)(p) ("The victim was pregnant"); Ind. Code § 35-50-2-9(b)(16) ("The victim of the murder was pregnant and the murder resulted in the intentional killing of a fetus that has attained viability"); 42 Pa. Cons. Stat. Ann. § 9711(d)(17) ("At the time of the killing, the victim was in her third trimester of pregnancy or the defendant had knowledge of the victim's pregnancy"); Tenn. Code Ann. § 39-13-

---

[15] See, e.g., *People v. Bunyard*, 45 Cal.3d 1189, 1239, 249 Cal.Rptr. 71, 105, 756 P.2d 795, 829 (1988), in which the California Supreme Court rejected the claim that the Eighth Amendment prohibits "the murder of a fetus [from raising] an otherwise non-capital case to capital status under a multiple murder special circumstance." See also *People v. Dennis*, 17 Cal.4th 468, 71 Cal.Rptr. 680, 950 P.2d 1035 (1998) (again finding that "the application of the multiple-murder special circumstance to the crimes of killing a pregnant woman and her fetus [does not constitute] a disproportionate penalty violating the state and federal Constitutions").

14

204(i)(16) ("The murder was committed against a pregnant woman, and the defendant intentionally killed the victim, knowing that she was pregnant"); Va. Code Ann. § 18.2-31(11) ("The willful, deliberate, and premeditated killing of a pregnant woman by one who knows that the woman is pregnant and has the intent to cause the involuntary termination of the woman's pregnancy without a live birth"). Furthermore, in Florida a killing that would be capital murder if the pregnant woman died is capital murder if the mother survives but her unborn child dies. Fla. Stat. Ann. § 782.09(1)(a). Therefore, the question presented here is not whether Louisiana *may* include the intentional killing of a pregnant woman among the aggravating factors that render an offender eligible for capital punishment but whether it *has*, which is a matter of statutory interpretation.

Louisiana R.S. 14:30(A)(3) provides that first degree murder is the killing of a human being "[w]hen the offender has a specific intent to kill or inflict great bodily harm upon more than one person." Louisiana R.S. 14:2(7) defines "person" in the criminal law to include "a human being from the moment of fertilization and implantation".[16] Thus, pursuant to these two statutory provisions, first degree murder does include the killing of a human being (the pregnant woman) when the offender has the specific intent to kill or inflict great bodily harm upon more than one person (the pregnant woman and the implanted conceptus).

Defendant argues that the killing of a fetus is not murder (and under subsequent legislative enactments it is, in fact, feticide) and therefore the legislature could not have intended first degree murder to encompass the murder of a pregnant woman with the intent to kill both her and her unborn child. In support of his argument, defendant relies on the decisions in *State v. Gyles*, 313 So.2d 799 (La. 1975) and *State v. Brown*, 378 So.2d 916 (La. 1979). In *Gyles*, Arthur Ray

---

[16] This provision also declares that a person includes "a body of persons, whether incorporated or not."

Gyles physically assaulted a woman who was eight-months pregnant and caused her to miscarry. He appealed his conviction for second degree murder of the stillborn child. Relying on the common law, which deemed that only those born alive are human beings, this Court found that conduct which causes an unborn child to be born dead does not constitute murder. The legislature responded by amending La. R.S. 14:2(7), which simply had indicated that a person includes a body of persons, whether incorporated or not, to provide: "'Person' includes a human being from the moment of fertilization and implantation and also includes a body of persons, whether incorporated or not." 1976 La. Acts 256. Then, in *State v. Brown*, *supra*, the Court considered the question whether the legislative amendment altered the definition of murder and the holding of *Gyles*. In *Brown*, Michael Brown killed Harriet St. Andre, who was pregnant. He was indicted separately with two counts of second degree murder. The jury found Brown guilty of manslaughter in the death of St. Andre. After the trial court overruled Brown's motion to quash the indictment for the killing of the fetus (the motion to quash was based on double jeopardy), Brown pleaded guilty to manslaughter of the fetus and appealed. This Court found as an error patent that murder is defined as "the killing of a human being" (rather than as the killing of a person) and the amendment redefining "person" had therefore not redefined murder.[17]

---

[17]Justice Marcus dissented in *Brown,* stating:

> I disagree with the conclusion of the majority that the indictment here, charging defendant with the murder of a "fertilized implanted fetus in the womb" of its mother does not charge a crime. Homicide (all grades) is the killing of a "human being." La. R.S. 14:29. The question is whether "human being" in the homicide statute includes a "fertilized implanted fetus in the womb" of its mother. I think so. La. R.S. 14:2(7) defines "person" as including a "human being from the moment of fertilization and implantation." Since the definition of a person includes a "human being from the moment of fertilization and implantation," I consider it clear that a "human being" in the homicide statute includes a "fertilized implanted fetus in the womb" of its mother. Accordingly, I respectfully dissent.

*Brown*, 378 So.2d at 918 (Marcus, J., dissenting). Regardless, *Brown* has not been overruled and its effect is limited since the legislature established the crime of feticide by Acts 1989, No. 777, §1.

Notwithstanding defendant's argument, the decisions in *Gyles* and *Brown* do not answer the question of whether the killing of a pregnant woman and her unborn child reflects the intent to kill more than one person for purposes of elevating a second degree murder to the first degree. However, the statutory provisions following the amendment of the definition of person in the criminal code answer that question sufficiently. Louisiana R.S. 14:30(A)(3) does not state that it requires the intent to commit multiple *murders*; it requires only the intent to kill or inflict great bodily harm upon more than one *person*. In determining the scope of a statute, a court must first look to its language. "If the statutory language is unambiguous, in the absence of 'a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.'" *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). "Only where ambiguity exists within the body of the enacted legislation does it become necessary to look further than the text to determine the legislative intent." *State v. Barbier*, 98-2923, p. 5 (La. 9/8/99), 743 So.2d 1236, 1239. Louisiana R. S. 14:30(A)(3) and La. R.S. 14:2(7) are clearly unambiguous. Also, the fact that the legislature established several grades of criminal feticide (see n.17, *infra*) does not reflect an intent to repeal the plain language of La. R.S. 14:30(A)(3) and La. R.S. 14:2(7).

Furthermore, in *State v. Keller*, 592 So.2d 1365 (La. App. 1 Cir. 1991), the First Circuit Court of Appeal considered the same question and reached the same conclusion. In *Keller*, Gregory Keller was indicted for the first degree murder of Andrea Simmons, who was pregnant, based on the specific intent to kill or to inflict great bodily harm upon more than one person, La. R.S. 14:30(A)(3). Keller sought to quash the prosecution on the basis that a fetus cannot be considered a

17

person for purposes the multiple-person aggravating element of La. R.S. 14:30(A)(3). The court of appeal noted that La. R.S. 14:30(A)(3) does not require the actual commission of two murders but rather that defendant have than intent to kill more than one person. The court found that, although a fetus is not considered a human being whose unlawful killing constitutes homicide, a fetus is nonetheless defined as a person in the criminal code. *Keller*, 592 So.2d at 1366.

Defendant contends the statutory language is not sufficiently clear to give him fair warning that he might face a charge of first degree murder for killing a pregnant woman. The Fair Warning Doctrine, however, demands "no more than a reasonable degree of certainty." *Boyce Motor Lines v. United States*, 342 U.S. 337, 340, 72 S.Ct. 329, 331, 96 L.Ed. 367 (1952). "The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." *Colten v. Kentucky*, 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972). A Texas court has rejected a fair warning challenge in a similar case. See *Lawrence v. State*, 211 S.W.3d 883 (Tex. Ct. App. 2006).

Regardless, in this case, this Court need not resolve the question of whether La. R.S. 14:30(A)(3) applies to the murder of a pregnant woman given the presence of a second aggravating factor, *i.e.*, that the killing took place in conjunction with a second degree kidnapping, La. R.S. 14:30(A)(1).

**Whether the state proved defendant killed Tavia Sills while engaged in a second degree kidnapping.**

Defendant contends the state presented insufficient evidence to show the murder took place during the course of a second degree kidnapping. He argues that, to prove he kidnapped the victim, the state must prove more than that he

18

persuaded or enticed the victim to accompany him; the state must also prove that at some point she had the desire to leave. According to defendant, the only evidence presented regarding the victim's state of mind was an eyewitness (Catherine Golston) who overheard Tavia scream because she feared the nearby cattle. Defendant argues that this was not sufficient to prove the victim did not want to accompany him. Defendant also contends that the trial court erred by not instructing the jury that the state must prove the victim expressed the desire or intent to leave.

As an initial matter, defendant's own statements to police provide evidence that the victim expressed a desire to leave. According to defendant, the victim expressed her fear on the path to the pond, she stopped walking, and "[t]hen she go I don't think I can do this no more."[18] Defendant cajoled her into walking again. After going a bit farther down the path, according to defendant, the victim clearly expressed the desire to leave: "So then I'm like come on. So I walk, and we walked to the other drop off. Then that when she kept saying I'm ready to go, I'm ready to go, to go."[19]

Louisiana R.S. 14:44.1 defines second degree kidnapping as follows:

> A. Second degree kidnapping is the doing of any of the acts listed in Subsection B wherein the victim is:
>
> (1) Used as a shield or hostage;
>
> (2) Used to facilitate the commission of a felony or the flight after an attempt to commit or the commission of a felony;
>
> (3) Physically injured or sexually abused;
>
> (4) Imprisoned or kidnapped for seventy-two or more hours, except as provided in R.S. 14:45(A)(4) or (5); or
>
> (5) Imprisoned or kidnapped when the offender is

---

[18] Statement titled "Interview of Lamondre Tucker (after autopsy)" at p. 8.
[19] *Id*. at 10.

armed with a dangerous weapon or leads the victim to reasonably believe he is armed with a dangerous weapon.

B. For purposes of this Section, kidnapping is:

(1) The forcible seizing and carrying of any person from one place to another; or

(2) The enticing or persuading of any person to go from one place to another; or

(3) The imprisoning or forcible secreting of any person.

Not enumerated among those elements is a requirement that a victim express a desire to leave. Furthermore, the words "enticing" and "persuading" in the statute suggest that defendant's view of how the offense may be committed is too narrow. See, e.g., *State v. Lee*, 02-1793, p. 32 (La. App. 4 Cir. 4/2/03), 844 So.2d 970, 991[20] (finding sufficient that a kidnapper lured the victim into his vehicle under the pretext of arranging for prostitution).

Defendant also argues that La. R.S. 14:44.1(A)(5) infringes on the constitutional right to keep and bear arms. He notes that the Louisiana Constitution was amended to require strict scrutiny to be applied to any restriction on this right.[21] Defendant alleges that the victim voluntarily accompanied him not knowing that he was carrying a firearm. According to defendant, his commission of a second degree kidnapping while carrying a firearm (La. R.S. 14:44.1(A)(5)) cannot be used to elevate the grade of murder to first degree because he cannot become eligible for the death penalty by engaging in a constitutionally protected activity. Defendant argues this statute is not sufficiently narrowly tailored if it encompasses constitutionally protected acts. Because the jury utilized his constitutionally protected right to keep and bear arms as an aggravating factor,

---

[20] *Writ denied*, 03-1247 (La. 10/10/03), 855 So.2d 330.
[21] La. Const. art. I, § 11 provides, "The right of each citizen to keep and bear arms is fundamental and shall not be infringed. Any restriction on this right shall be subject to strict scrutiny."

defendant maintains the death sentence must vacated and the conviction reduced to second degree murder.

As an initial matter, defendant's assertion that the victim accompanied him unaware that he was carrying a firearm is contradicted by his own statements to police. According to defendant, the victim expressed fear of the wooded location, asked if defendant was also afraid, and he responded "That what we got a gun for."[22] Regardless, defendant became eligible for capital punishment when the jury found him guilty of intentionally killing a human being while he was engaged in the perpetration of a second degree kidnapping. Notably, "the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *McDonald v. City of Chicago*, 561 U.S. 742, 786, 130 S.Ct. 3020, 3047, 177 L.Ed.2d 894 (2010) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626, 128 S.Ct. 2783, 2816, 171 L.Ed.2d 637 (2008)).[23] Thus, the U.S. Supreme Court has indicated that "the Second Amendment protects a personal right to keep and bear arms *for lawful purposes*". *Id.*, 561 U.S. at 781, 130 S.Ct. at 3044 (emphasis added); *see also United States v. Greeno*, 679 F.3d 510, 520 (6th Cir. 2012) ("[T]he historical understanding of the right to keep and bear arms . . . did not extend to possession of weapons for unlawful purposes. To hold the contrary would suggest that the Second Amendment protects an individual's right to possess a weapon for criminal

---

[22] Statement titled "Lamondre Tucker (40 minutes)" at p. 3; see also Statement titled "Tucker Crime Scene (4 1/2 minutes)" at p. 1 ("But I said—she like, 'Y'all gonna be scared to come back here?' I said, 'Huh-uh, that's what we got a gun for, like that there.'"). In another version, defendant said "Okay, I had the gun or whatever you know what I'm saying. And then she asked was like why got the gun. I said just, really I just got it." Statement titled "Interview of Lamondre Tucker (random)" at pp. 1-2.

[23] In addition, the right to keep and bear arms is not absolute. See, e.g., *State v. Eberhardt*, 13-2306, pp. 9-12 (La. 7/1/14), 145 So.3d 377, 383-85 (concluding that R.S. 14:95.1, prohibiting possession of a firearm or carrying a concealed weapon by a person convicted of certain felonies, "serves a compelling governmental interest that has long been jurisprudentially recognized and is grounded in the legislature's intent to protect the safety of the general public from felons convicted of specified serious crimes, who have demonstrated a dangerous disregard for the law and the safety of others").

purposes."). Defendant here was engaged in the unlawful act of kidnapping. He has no constitutional right to use a firearm to facilitate his commission of the crime. Therefore, the application of strict scrutiny mandated by La. Const. art. I, § 11 does not benefit the defendant who was engaged in criminal behavior.

In sum, the evidence overwhelmingly proved defendant committed the crime of second degree kidnapping when he enticed/persuaded Tavia Sills to accompany him from one place to another and into the woods, for purposes of facilitating the commission of another felony (her murder) by means of the firearm in his possession, thereby causing her physical harm (death). Given the jury found this aggravating circumstance proved beyond a reasonable doubt in the penalty phase, and considering Louisiana duplicates aggravating circumstances in both phases of a capital trial, this Court can assume that jurors also found second degree kidnapping in the guilt phase as an independent basis for returning a general verdict of guilty as charged. See *State v. Wright*, 01-0322, p. 15 (La. 11/22/02), 834 So.2d 974, 987 ("[I]n this case, the Court *can* ascertain the grounds upon which the jury convicted defendant of first degree murder given that jurors unanimously found both of the two aggravating factors at sentencing [aggravated or forcible rape; age of the victim] which the state relied upon during the guilt phase of trial. Therefore, the jurors most assuredly relied on the victim's age when it found defendant guilty of first degree murder. . . . That being the case, the state's failure to present constitutionally sufficient evidence that the victim was killed during the course of an aggravated or attempted aggravated rape does not warrant reversal of the conviction.") (distinguishing *Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931).[24] Thus, any failure by the state to prove

---

[24] *Stromberg* involved the prosecution and conviction of a summer camp counsellor, an avowed communist, under a California statute that prohibited the display of a red flag (of the sort defendant raised every day in the course of pledging allegiance to the workers of the world) as (1) a sign of opposition to organized government, or (2) as an invitation to anarchistic action, or

defendant killed Tavia Sills with the specific intent of killing more than one "person" would not in any event require reversal of the conviction.

## Pre-trial Claims

### *Motion to suppress*

Defendant contends that his statements were not knowingly and voluntarily made because officers exploited his immaturity and unfamiliarity with police methods, and they had promised the charge would be reduced to manslaughter and his mother's impounded car would be returned to her if he confessed. Therefore, defendant contends the trial court erred in denying both his motion to suppress his statements and motion for new trial on this basis without conducting an evidentiary hearing.

If a statement is a product of custodial interrogation, the state must show that the person was advised before questioning of his right to remain silent; that any statement he makes may be used against him; and, that he has a right to counsel, either retained or appointed. *Miranda v. Arizona*, 348 U.S. 436, 444, 86 S.Ct. 1602, 1612 (1966). The state bears a "'heavy burden . . . to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel,'" *State v. Green*, 94-0887, p. 10, 655 So.2d 272, 280 (La. 5/22/95) (quoting *Tague v. Louisiana*, 444

---

(3) as an aid to seditious propaganda. Jurors returned a general verdict of guilt under a trial court instruction that emphasized the use of disjunctive "or" in the statute and thereby permitted them to find defendant guilty of any of the three ways in which the statute could be violated. In reversing the defendant's conviction, the Supreme Court readily found that clauses (2) and (3) of the statute passed constitutional muster but that the first clause ran afoul of the First Amendment and was therefore unconstitutional. To the extent that the trial court's general charged permitted a verdict of guilt based *solely* on this constitutionally invalid ground, and unable to determine what jurors actually found in returning their general verdict, the Supreme Court set aside the defendant's conviction and sentence.

*Wright* distinguished *Stromberg* not only on grounds that the Court could determine what jurors found when they returned their general verdict of guilty as charged but also on grounds that the aggravating circumstance that the state failed to prove was not, in any event, unconstitutionally invalid. Similarly, in the present case, the Court can determine the bases upon which jurors returned their general verdict at the guilty stage and defendant makes no argument here, beyond a purely statutory claim, that the Eighth Amendment prohibits a state from punishing the murder of a pregnant woman as a capital offense.

23

U.S. 469, 470, 100 S.Ct. 652, 653, 62 L.Ed.2d 622 (1980)). Nevertheless, appellate courts do not review the record de novo but must defer to the finding of the trial judge "unless his finding is not adequately supported by reliable evidence." *Green*, 94-0887 at p. 11, 655 So.2d at 281. A trial court is accorded that deference "because the evaluation of witness credibility often plays such a large part in the context of a motion to suppress a confession." *Id.*

The record contains a waiver of rights form signed by defendant. Two officers testified at the suppression hearing that defendant was repeatedly *Mirandized* and waived his rights. The recorded interviews with defendant captured two instances of the advisement and waiver of his rights.[25] At no point in the recorded interviews does defendant exercise his right to remain silent or ask for counsel.[26] Although defendant testified at the suppression hearing that he did not remember being *Mirandized* or signing the waiver, he recognized his signature on the waiver form and he conceded that he could have been *Mirandized* but had forgotten it. Defendant's mother testified she had advised her son to ask for a lawyer, but did not know whether he had done so. The only evidence in the record supporting defendant's allegation that he requested counsel is his own testimony at the suppression hearing that he requested a lawyer during his third or fourth interview before accompanying Detective Demery to the drainage canal to locate the discarded the pistol. The trial court's decision to credit the testimony of the officers is well supported by the record.

---

[25] Interview titled "Interview of Lamondre Tucker (after autopsy) at pp. 1-3; Interview titled "Lamondre Tucker (40 minutes)" at pp. 1-2.

[26] Defendant's only reference to counsel appears in his statement titled "Tells Tucker Recorder is off" at p. 25, in which he indicates that his auntie recommended he get a lawyer before he accompanied Detective Demery to the police station ("I ain't—I'm not—I ain't scared. The only—like I say, the only thing I was scared of—I ain't scared of most of this shit or worried about it. Cause like after today, you know what I'm saying, my supposedly auntie came up there talking about 'You need to get you a lawyer.' I say, 'For what?' She told, 'Cause there's people coming after you.' I said, 'Why is that?' She said, 'Well, I don't know. That's what I just heard.' And I was like it ain't making no sense. Cause then you turn around and ask me can I walk to your car.").

Defendant, however, claims his statements were the result of promises or inducements.[27] When claims of police misconduct are raised, the state must specifically rebut the allegations. *State v. Vessell*, 450 So.2d 938, 942-43 (La. 1984). When deciding whether a statement is knowing and voluntary, a court considers the totality of circumstances under which it is made, and any inducement is merely one factor in the analysis. *State v. Lavalais*, 95-0320, p. 6 (La. 11/25/96), 685 So.2d 1048, 1053; *State v. Lewis*, 539 So.2d 1199, 1205 (La. 1989).[28] Here, defendant alleges he was promised that the charge would be reduced to manslaughter and his mother's impounded car returned to her if he confessed to an accidental shooting. The totality of the recorded interviews, however, suggests otherwise. Detective Demery did, in fact, advise defendant about the distinction between manslaughter and murder, and did repeatedly exhort defendant to tell the truth and admit if he did, in fact, kill the victim accidentally. The detective did not, however, promise that the charge would be reduced. The detective indicated that he would like to believe the shooting was accidental, he did not wish to believe defendant was a murderer, and he told defendant that lying made him look worse both in the eyes of the law and to the community, and in particular to the mother of his three-year-old son.[29] The detective warned defendant that physical evidence would ultimately reveal what happened and he repeatedly urged defendant to tell the truth, whatever it may be. He repeatedly assured defendant that if the crime

---

[27] It is well settled that a confession obtained by any direct or implied promises or by exertion of improper influence are involuntary and inadmissible as a matter of constitutional law. *Hutto v. Ross*, 429 U.S. 28, 29-30, 97 S.Ct. 202, 203-04, 50 L.Ed.2d 194 (1976). Louisiana R.S. 15:451 also prohibits the use of inducements or promises to secure a confession.

[28] The question in each case is generally, under the particular facts and circumstances, whether the defendant's will was overborne at the time he confessed. *Leyra v. Denno*, 347 U.S. 556, 558, 74 S.Ct. 716, 717, 98 L.Ed. 948 (1954); *Watts v. Indiana*, 338 U.S. 49, 52, 53, 69 S.Ct. 1347, 1348, 1349, 93 L.Ed. 1801 (1949); *Chambers v. Florida*, 309 U.S. 227, 237-39, 60 S.Ct. 472, 477-78, 84 L.Ed. 716 (1940).

[29] The detective warned defendant that if he went to prison as a cold-blooded murderer he would jeopardize his relationship with the mother of his three-year-old son. Appellate courts have routinely held that "confessions given in response to exhortations to consider the health, well-being and liberty of close relatives are admissible." *State v. Massey*, 535 So.2d 1135, 1141, (La. App. 2 Cir. 1988) (citing *State v. Baylis*, 388 So.2d 713, 716 (La. 1980)); *State v. Weinberg*, 364 So.2d 964, 970 (La. 1978).

was, in fact, an accidental shooting, then it would be treated as such.[30] Detective Demery's only reference to defendant's mother's car appeared in the context of asking defendant to save everyone the necessity of an extensive investigation.[31] It was not a promise to return the car in exchange for a confession.

Defendant argues that, even if the detective's statements did not amount to promises, his immaturity and low intellectual functioning would have caused him to interpret them as such. In support, he offers the opinion of psychologist Dr. Mark Vigen, obtained on March 11, 2011, in anticipation of the penalty phase. According to Dr. Vigen, the 18-year-old defendant is a "pseudo adult" who lives and acts like an adult but thinks like a child.[32] The defense did not subject Dr. Vigen's expert opinion to adversarial testing by calling him to testify at the penalty phase but rather attached his report to a post-verdict motion.[33] As is noted below in the context of defendant's claim that his immaturity and low intellectual

---

[30] Courts have held that a mild exhortation to tell the truth, or a remark that if the defendant cooperates the officer will "do what he can" or "things will go easier," will not negate the voluntary nature of a confession. *State v. Petterway*, 403 So.2d 1157, 1159-60 (La. 1981); *State v. Magee*, 93-0643 (La. App. 3 Cir. 10/5/94), 643 So.2d 497; *State v. English*, 582 So.2d 1358, 1364 (La. App. 2 Cir.), *writ denied*, 584 So.2d 1172 (1991). Even informing a defendant that others (district attorney, judge, etc.), will be advised of any cooperation is not sufficient inducement to overcome the free and voluntary nature of a confession. *State v. Vernon*, 385 So.2d 200, 204 (La. 1980). Notably, in *State v. Lavalais*, 95-0320 at 7, 685 So.2d at 1053, this Court held that an officer's comments to the defendant that he would likely receive more favorable treatment if he confessed as opposed to failing a polygraph examination did not constitute inducements rendering the subsequent confession involuntary.

[31] See Statement titled "Tells Tucker Recorder is off" at pp. 32-33.

[32] R.6 at 1317.

[33] In reviewing the trial court's ruling on a defendant's motion to suppress, this Court has stated that it will look to the totality of the evidence presented at the motion to suppress hearing and the trial. *State v. Burkhalter*, 428 So.2d 449, 455 (La. 1983); *State v. West*, 408 So.2d 1302, 1308 (La. 1982) ("Although the state put on no evidence at the hearing on the motion to suppress, we look to the totality of the evidence produced both at that hearing and at trial when we assess whether the state has carried its burden"). However, this Court has noted further that "this jurisprudential rule will only be applied where the defendant has filed a motion to suppress alleging a statement was inadmissible on a specific constitutional ground and later a reviewing court looks to his trial testimony, in addition to the testimony presented at the motion hearing, to determine whether the motion to suppress should have been granted on those grounds." *State v. Montejo*, 06-1807, p. 25 (La. 5/11/10), 40 So.3d 952, 969. Thus, "[t]he jurisprudential rule is not applied where the grounds for suppression were not asserted in the motion to suppress." *Id.* Just as the Court has "never allowed a defendant to allege facts for the first time in trial testimony which would support a new argument for suppression of evidence", *id.*, 06-1807 at 25, 40 So.3d at 969-70, defendant may not allege a new basis for suppressing his statements for the first time in a motion for new trial supported by evidence he did not present earlier, in the absence of a showing of new and material evidence not discovered before despite the exercise of reasonable diligence, La. C.Cr.P. art. 851(3). Here, defendant has not shown reasonable diligence.

26

functioning render him ineligible for the death penalty, Dr. Vigen determined that defendant has a full scale IQ of 74. Nonetheless, although defendant was required to repeat his senior year of high school because he failed American History, he did complete the other years of school. His school records indicate that his grades varied widely, ranging from As to Fs, with a final GPA of 2.02. During the police interview defendant indicated that he could read and write and demonstrated no confusion. Defendant's football coach described him as a "thinking" player. For comparison, see *State v. Green*, 94-0887, pp. 7-19 (La. 5/22/95), 655 So.2d 272, 278-84 (mildly intellectually disabled defendant's waiver of rights was knowing and intelligent, even though psychologist testified defendant was unable to comprehend his rights; psychologist also testified defendant was educable and could be made to understand rights, police officers testified defendant understood his rights in part because of his prior criminal history); *State v. Istre*, 407 So.2d 1183, 1186-87 (La. 1981) (19-year-old who had I.Q. of 68 and who did not know his own age intelligently waived rights, which were explained in simplistic terms that he apparently understood); see also *State v. Brown*, 414 So.2d 689, 696 (La. 1982) ("'[M]oderate mental retardation and low intelligence or illiteracy do not of themselves vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession.'") (citations omitted); but see *State v. Anderson*, 379 So.2d 735, 736 (La. 1980) (fact that defendant was an illiterate, unemployed 17-year-old with the mental age of 8 and an I.Q. of between 50 and 69, coupled with ambivalent police testimony about whether he ever understood the rights they attempted to explain to him, supported a conclusion that he was incapable of understanding his rights or the ramifications of foregoing them; hence, there was no knowing, intelligent waiver).

Most significant, Detective Demery allowed the adult defendant to speak

with his mother twice during the interviews. Defendant's mother testified that she waited only 10 minutes at the police station before being allowed to see her son. She said she met with him privately for 10-20 minutes. Defendant also testified at the suppression hearing that he was permitted to meet with his mother at his request. The recorded statements show that the detective acceded to defendant's request to speak with his mother on the phone when he was interviewed the next day at jail. The state sufficiently rebutted defendant's allegations of police misconduct and the totality of the circumstances supports the trial court's determination that defendant made a knowing, intelligent, and voluntary waiver of his rights.

## Voir Dire Claims

### Biased and Non-representative Jury

Defendant contends that the death qualification process produces a biased jury that does not represent a fair cross section of the community but instead systematically excludes African Americans. Defendant alleges death qualification excluded 51.3% of African Americans while excluding only 20% of non-African Americans. Defendant also alleges death qualified juries are more prone to convict. Defendant argues separate guilty and penalty phase juries should have been used so that the jury that considered his guilt could better reflect the community.[34] Defendant also argues that the use of a death qualified jury violates the Eight Amendment because it gives no opportunity for the evolving standards of decency of the community to be reflected in jury verdicts.[35] Defendant contends the trial

---

[34] The First Circuit has determined that bifurcated juries in capital trials are not authorized in federal law. See *United States v. Green*, 407 F.3d 434 (1st Cir. 2005), *cert. denied*, 546 U.S. 962, 126 S.Ct. 497, 163 L.Ed.2d 365 (2005); see also Federal Death Penalty—Bifurcated Trials—First Circuit Holds that Judges may not Impanel Separate Juries for Guilt and Penalty Phases in Capital Cases, 119 Harv. L. Rev. 654 (2005).

[35] This view is advocated for by Susan Raeker-Jordan, *A Pro-Death, Self-Fulfilling Constitutional Construct: The Supreme Court's Evolving Standard of Decency for the Death Penalty*, 23 Hastings Const. L.Q. 455, 537-46 (1996). The Supreme Court of California rejected it in *People v. Taylor*, 48 Cal.4th 574, 603-04, 108 Cal.Rptr.3d 87, 121-22, 229 P.3d 12, 41

court erred in denying his motion for new trial on this basis without conducting an evidentiary hearing.

Louisiana C.Cr.P. art. 798, governing causes for challenge by the state, was drafted to conform to the constitutional requirements set forth in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d. 776 (1968) (holding that a prospective juror who would vote automatically for a life sentence is properly excluded). See also *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). In *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the U. S. Supreme Court held that the Constitution does not prohibit excluding potential jurors under *Witherspoon* or that "death qualification" resulted in a more conviction-prone jury. Likewise, this Court has repeatedly rejected the claim that the *Witherspoon* qualification process results in a death-prone jury. *State v. Robertson*, 97-0177, pp. 19-20 (La. 3/4/98), 712 So.2d 8, 25-26; *State v. Sullivan*, 596 So.2d 177, 186-87 (La. 1992); *State v. Lindsey*, 543 So.2d 886, 896 (La. 1989); *State v. Brown*, 514 So.2d 99, 103-04 (La. 1987); *State v. Bates*, 495 So.2d 1262, 1272 (La. 1986); *State v. Ford*, 489 So.2d 1250, 1259 (La. 1986); *State v. Ward*, 483 So.2d 578, 582-83 (La. 1986); *State v. Jones*, 474 So.2d 919, 927 (La. 1985); *State v. James*, 431 So.2d 399, 402 (La. 1983).

During voir dire, defense counsel objected that the death qualification process was working to disproportionately remove African-Americans from the

---

(2010) (citations omitted):

> We likewise find flawed the premise underlying defendant's assertion that death qualification, by eliminating the segment of the community that opposes the death penalty, skews the data courts typically rely on to determine "evolving standards of decency" for Eighth Amendment purposes. Through the death qualification process, individuals may be excused not only for their unyielding opposition to capital punishment but also for their intractable support of it. We reject defendant's contention that death qualification is irrational because it disqualifies individuals based on their moral beliefs when the penalty phase determination is "'inherently moral and normative.'" Disqualified jurors are properly excused for cause, not on the basis of their personal, moral beliefs regarding the death penalty, but because of their inability to "temporarily set aside their own beliefs in deference to the rule of law."

jury.  In *McCree*, 476 U.S. at 165, 106 S.Ct. at 1760, the Supreme Court held that the Constitution does not "prohibit the removal for cause, prior to the guilt phase of a bifurcated capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of the trial."  In particular, the Court rejected McCree's contention that "death qualification" prior to the guilt phase of the trial violated his right under the Sixth and Fourteenth Amendments to an impartial jury selected from a representative cross section of the community. *Id.*, 476 U.S. at 184, 106 S.Ct. at 1770. The Supreme Court explained that the fair cross section requirement applies only to venires, not to petit juries. *Id.*, 476 U.S. at 173, 106 S.Ct. at 1765.  Accordingly, petit juries do not have to "reflect the composition of the community at large." *Id.* More importantly, it was pointed out that, even if this requirement were applied to petit juries, no fair cross section violation would be established when "*Witherspoon*-excludables" were dismissed from a petit jury, because they do not constitute a distinctive group for fair cross section purposes. *Id.*, 476 U.S. at 174, 106 S.Ct. at 1765.  In *Buchanan v. Kentucky*, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), the Court reiterated those views and then indicated "[g]iven this conclusion, there is no reason to address petitioner's description of the result of the 'death qualification'—the race, sex, political party, and age composition of the jury in his case." *Buchanan*, 483 U.S. at 416 n.17, 107 S.Ct. at 2914 n.17.

Defendant conceded during voir dire that the state was not acting from racial animus or intentionally using the death-qualification process as a proxy for race, rather it was the death-qualification process itself that was flawed.  Approximately 94% of the state's cause challenges during death qualification were granted. In contrast, 50% of the defense's cause challenges were granted during death

qualification. However, the defense only objected to five of the state's 35 cause challenges. Of those five, the defense made no effort to question these prospective jurors further[36] to determine whether they could not and would not "conscientiously obey the law" or rather they merely "firmly believe[d] that the death penalty is unjust [but] may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law",[37] as defendant characterized them for the first time in his motion for new trial. In contrast, when the defense challenged prospective jurors for cause on the basis that they were unable to consider a life sentence as required by law, the state attempted to instruct those prospective jurors on the law, the necessity of considering both penalties as well as all aggravating and mitigated circumstances, and then questioned them on their ability and willingness to do so.[38] This claim is without merit.

### Denial of Cause Challenge

Defendant claims the trial court failed to exclude jurors whose responses revealed they were unable to give meaningful consideration to a life sentence. Defendant identifies eight prospective jurors who defendant claims should have been removed for cause: John Forehand; Robert Litton; Alvin Coco; Robert Rogers; Clarence Hicks; Joy Birch; Patricia Johnson; and Anita Spencer.

"[A] challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied." *State v. Hallal*, 557 So.2d 1388, 1389-90 (La. 1990).

---

[36] For example, defense counsel declined the opportunity to question prospective juror Richard Clark further but rather insisted that the state's cause challenge simply be denied based on the disproportionate effect of death qualification. R.14 at 3050. The trial court later indicated that both the state and the defense had the same opportunity for individual voir dire on these concerns. R.15 at 3241.

[37] *McCree*, 476 U.S. at 176, 106 S.Ct. at 1766.

[38] <u>See</u>, <u>e.g.</u>, R.13 at 2839, 2850, 2885,

Prejudice is presumed when a challenge for cause is denied erroneously by a trial court and the defendant ultimately exhausts his peremptory challenges.[39] *State v. Robertson*, 92-2660 at 3-4, 630 So.2d at 1280; *State v. Ross*, 623 So.2d 643, 644 (La. 1993). A trial court is vested with broad discretion in ruling on challenges for cause and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. *State v. Cross*, 93-1189, pp. 6-7 (La. 6/30/95), 658 So.2d 683, 686-87; *State v. Robertson*, 92-2660 at 4, 630 So.2d at 1280.

A review of the voir dire record as a whole reveals no abuse of discretion.

**John Forehand**

John Forehand initially indicated that he would not consider a life sentence for one who intentionally kills more than one person. However, after the pertinent law was explained to him, he indicated that he could consider a life sentence for one who intentionally kills more than one person and he would consider all mitigating circumstances. With further questioning, it became apparent that Mr. Forehand had initially misinterpreted the question as a request to commit to vote for a life sentence rather than to consider it as one of two possible penalties.

**Juror Robert Litton**

Robert Litton stated that he believed the death penalty was appropriate for intentional and violent murders but he also said that he could consider either penalty depending on the circumstances. He believed a life sentence was more

---

[39] Even in capital cases, the defendant must use one of his remaining peremptory challenges to remove the juror on his way to ultimately exhausting his challenges to preserve review of the trial court's denial of a cause challenge. See, e.g., *State v. Campbell*, 06-0286, p. 71 (La. 5/21/08), 983 So.2d 810, 856 ("[A]n erroneous ruling on a challenge for cause which does not deprive a defendant of one of his peremptory challenges does not provide grounds for reversing his conviction and sentence. A defendant thus must use one of his remaining peremptory challenges curatively to remove the juror or waive the complaint on appeal, even in a case in which he ultimately exhausts his peremptory challenges."). The record in the present case does not clearly indicate which party exercised each peremptory challenge. Nonetheless, the record does contain the statement that the defense was exercising its last peremptory challenge. See R.15 at 3406-07. Furthermore, defendant alleges, and the state concedes, see state's brief at p. 46, that the defense exhausted its full allotment of peremptory challenges.

suitable for an accidental killing and death more suitable for intentional killings, and he initially indicated he would not consider a life sentence for one who intentionally kills more than one person or kills while committing a kidnapping. He initially stated that the only mitigating circumstance he would consider is insanity. After he was repeatedly instructed that the law required him to consider both penalties and all mitigating circumstances, he ultimately acquiesced that he would be able to follow the law as instructed.

**Alvin Coco**

Alvin Coco initially stated that he supported the death penalty but could consider both sentencing options. He believed the death penalty was appropriate for planned murders but he would not vote for it automatically. He initially stated that he would not consider a life sentence for one who intentionally kills more than one person or while committing a kidnapping. He also initially indicated that the only mitigating circumstance he would find significant is if one were only a principal to the offense. After being repeatedly instructed on the pertinent law, he ultimately indicated that he could consider either penalty and all mitigating circumstances.

**Robert Rogers**

Robert Rogers initially stated that he "probably could" consider a life sentence for one who intentionally kills but he was unsure whether he could consider a life sentence for one who kills while committing a kidnapping and he said he probably could not consider a life sentence for one who intentionally kills a pregnant woman. When asked if that meant he would automatically vote for death for one who murders a pregnant women, he responded no and he clarified that he only meant he would not have a problem with voting for death under those circumstances.

33

**Clarence Hicks**

Clarence Hicks initially stated that it would be "very difficult" not to return a death verdict for one who intentionally killed more than one person but he also stated that he could return a life verdict. He clarified that he leaned toward a death verdict for a multiple murderer but that he could consider both sentencing options depending on the circumstances.

**Joy Birch**

Joy Birch initially stated that she could consider either penalty, she emphasized the gravity of the decision, and she indicated that she would not automatically vote for either penalty. She indicated that she leaned toward the death penalty for someone who intentionally kills a woman he knew was pregnant but she would consider both penalties and it would depend on the circumstances of the offense. She insisted that she could be fair and open-minded and that she could consider a life sentence for one who killed a pregnant woman.

**Patricia Johnson**

Patricia Johnson initially stated that she could consider a life sentence but she also stated that, for first degree murder, she was "more likely" to vote in favor of death. She revealed that her friend was murdered in 1996 and she expressed concern for her ability to be fair and impartial because of that experience. However, she ultimately concluded that she could keep that experience from unduly influencing her decision-making and she would decide the present case solely on the evidence presented at this trial.

**Anita Spencer**

Anita Spencer stated that she supported the death penalty but could vote for either a life or death sentence. She believed a death sentence is appropriate for a senseless murder. She initially indicated that she would not consider a life

sentence for one who kills more than one person and the only mitigating circumstance she would consider is insanity. After being instructed on the pertinent law, she said that she was confused when she answered earlier but now that she understood the law she could consider both sentencing options.

After reviewing the questions asked these jurors and their responses in their context, the prospective jurors, in varying degrees,[40] favored the death penalty as a general principle but when instructed on the governing law indicated they could adhere to it. Some showed some initial confusion as to what was being asked, which was clarified by further instruction on the law. The defense inquired into their feelings divorced from the context of the legal framework in which they would operate.[41] But when fully informed of their obligations if selected, the prospective jurors all indicated their ability and willingness to consider both sentencing options and all mitigating circumstances as instructed. "[E]ven when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably [inferred]." *State v. Jones*, 474 So.2d 919, 929 (La. 1985). Yet a refusal to disqualify a prospective juror on grounds he is biased does not constitute reversible error or an abuse of discretion if, after further examination or rehabilitation, the juror demonstrates a willingness and ability to decide the case fairly according to the law and evidence. *State v. Howard*, 98-0064, pp. 7-10 (La. 4/23/99), 751 So.2d 783, 795-97. A review of the full transcript indicates that the state successfully rehabilitated these eight prospective jurors and

---

[40] The defense asked all prospective jurors to rate their views on a scale of 1 to 7, in which 1 represented always favoring a death sentence, 4 was neutral, and 7 represented always favoring a life sentence. These prospective rated themselves as follows: John Forehand (4), Robert Litton (2), Alvin Coco (4), Robert Rogers (4), Clarence Hicks (4.5), Joy Birch (4), Patricia Johnson (2.5), and Anita Spencer (2). Notably, none rated themselves a 1 on the defense's scale and several were neutral.

[41] Defense counsel in fact conceded that counsel was "not asking of you what the law is . . . [w]hat we're talking about now is your feelings and how you personally feel". R.14 at 3020; see also R.14 at 3019 ("I'm not asking what the law is.").

their responses as a whole demonstrate a willingness and ability to decide the case fairly according to the law and evidence.  Defendant's claim is without merit.

## Guilt Phase Claims

*Right to Counsel*

Defendant contends he was denied his right to counsel, who labored under an actual conflict of interest and should have been allowed to withdraw after informing the court about the efforts of defendant and his mother to coach a prospective juror Latisha Griffin, who was opposed to the death penalty, about what to say during death qualification so that she would not be removed for cause. Defendant argues defense counsel, after they became potential witnesses to jury tampering, were unable to communicate with him (or his mother) freely and could not fully advocate for him after the conflict arose. For example, defendant alleges counsel stopped sharing information about prospective jurors and jury selection strategy and potential witnesses and what questions they might be asked for fear of being accused of facilitating jury and witness tampering. Defendant complains that counsel did not cross-examine 18 of 24 witnesses, cross-examined the remaining witnesses for the state only briefly, rested without calling any witnesses for the defense, and conceded during closing remarks that defendant was guilty of second degree murder and feticide.  Finally, defendant alleges he was not informed that counsel would concede in his closing remarks that defendant was guilty of second degree murder and feticide, and he did not wish counsel to do so.

Every defendant is entitled to "representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981). An actual, as opposed to a potential, conflict of interest exists "when, during the course of the representation, the attorney's and defendant's interests 'diverge with respect to a material factual or legal issue or to a course of action.'"

36

*Winkler v. Keane*, 7 F.3d 304, 307 (2d Cir. 1993) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 356 n.3, 100 S.Ct. 1708, 1722 n.3, 64 L.Ed.2d 333 (1980)), *cert. denied*, 511 U.S. 1022, 114 S.Ct. 1407, 128 L.Ed.2d 79 (1994). In *Mickens v. Taylor*, 535 U.S. 162, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002), the U.S. Supreme Court further clarified the meaning of "actual conflict" for the purposes of the Sixth Amendment when the claim is raised for the first time in a post-verdict context. Under *Mickens*, a conflict that deprives a defendant of his constitutional right to the effective assistance of counsel is "precisely a conflict *that affected counsel's* performance − as opposed to a mere theoretical division of loyalties." *Mickens*, 535 U.S. at 171, 122 S.Ct. at 1243 (emphasis in original). The court stated that "defects in assistance [of counsel] that have no probable effect upon the trial's outcome do not establish a constitutional violation." *Id.*, 535 U.S. at 166, 122 S.Ct. at 1240.

Although a defendant generally is required to demonstrate prejudice to prevail on a claim of ineffective assistance of counsel, *Strickland v. Washington*, 466 U.S. 668, 693, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984), prejudice is presumed when counsel is burdened by an actual conflict of interest. *Id.* at 692, 104 S.Ct. at 2067; *United States v. Iorizzo*, 786 F.2d 52, 58 (2d Cir. 1986). This presumption is "fairly rigid." *Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067. Moreover, "once the defendant establishes that there was an actual conflict, he need not prove prejudice, but simply that a 'lapse in representation' resulted from the conflict." *Iorizzo*, 786 F.2d at 58 (quoting *Cuyler*, 446 U.S. at 349, 100 S.Ct. at 1718). To prove a lapse in representation, a defendant must "demonstrate that some 'plausible alternative defense strategy or tactic might have been pursued,' and that the 'alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.'" *United States v. Levy*, 25 F.3d 146, 157 (2d Cir. 1994) (quoting *Winkler*, 7 F.3d at 309).

Courts generally disqualify trial counsel pretrial if it appears counsel will or should be called as a witness at trial. See, e.g., *United States v. Kwang Fu Peng*, 766 F.2d 82, 86 (2d Cir. 1985); see also *United States v. Locascio*, 6 F.3d 924, 933 (2d Cir. 1993) (noting that "[e]ven if the attorney is not called, however, he can still be disqualified, since his performance as an advocate can be impaired by his relationship to the events in question"). Here, however, defense counsel had no relationship to the offense for which defendant was on trial. There appeared to be no necessity for counsel to be called as a witness in the present trial[42] after the state advised that they would not use this incident in its case-in-chief. Furthermore, defendant has not alleged that defense counsel was involved in any way in the jury tampering. Thus, the conflict here is speculative rather than actual.

In *Nix v. Whiteside*, 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1985), the Supreme Court determined that the Sixth Amendment right to assistance of counsel is not violated when an attorney refuses to cooperate with defendant in presenting perjured testimony at trial. Whiteside sought a new trial on the basis that defense counsel warned him before trial not to falsely testify that he saw "something metallic" in the victim's hands to bolster his claim of self-defense, and counsel threatened to inform the court if Whiteside committed perjury. *Whiteside*, 475 U.S. at 161-62, 106 S.Ct. at 991-92. The Supreme Court found that counsel's "conduct fell within the wide range of professional responses to threatened client perjury acceptable under the Sixth Amendment." *Id.*, 475 U.S. at 166, 106 S.Ct. at 994. The court noted that counsel's obligation to provide effective assistance "is limited to legitimate, lawful conduct compatible with the very nature of a trial as a search for truth" and did not extend to "in any way assisting the client in presenting false evidence or otherwise violating the law". *Id.* Additionally, the court found that

---

[42] Furthermore, according to the state, defense counsel were not even called as witnesses after additional charges were later levied against defendant and his mother arising from this jury tampering incident. State's brief at p. 62-63.

defense counsel had a "special duty . . . to prevent and disclose frauds upon the court". *Id.*, 475 U.S. at 168-69, 106 S.Ct. at 995. Therefore, the Court found that counsel's action did not amount to any "failure to adhere to reasonable professional standards that would in any sense make out a deprivation of the Sixth Amendment right to counsel." *Id.*, 475 U.S. at 171, 106 S.Ct. at 996. The court further reviewed the record and found it showed "the accused enjoyed continued representation within the bounds of reasonable professional conduct" and "at most [Whiteside] was denied the right to have the assistance of counsel in the presentation of false testimony". *Id.*, 475 U.S. at 174, 106 S.Ct. at 998.

Similarly, in the present case defense counsel responded ethically to Tucker's attempt at corrupting the judicial process by inserting a "poison pill" into the jury by committing jury tampering, which, when committed in the context of a capital trial, is a felony offense punishable by a maximum sentence of 99 years imprisonment at hard labor. La. R.S. 14:129(B)(2)(a). Counsel acted within the dictates of Rule 3.3(b) of the Rules of Professional Conduct, which provides: "A lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal." Counsel's adherence to the rule did not deprive Tucker his right to the assistance of counsel.

Furthermore, the interests of defendant and defense counsel did not diverge at all with respect to any fact, legal issue, or course of action. An "actual conflict" exists only when "the attorney's and defendant's interest diverge with respect to a material factual or legal issue or to a course of action." *United States v. Moree*, 220 F.3d 65, 69 (2d Cir. 2000) (citation and internal quotations omitted). Although defense counsel allege they felt obliged to keep certain information from defendant

during the remaining voir dire to prevent another jury tampering incident, that prudent decision does not demonstrate an alternative strategy existed that was in conflict with or not undertaken due to counsel's other loyalties or interests. Although defendant complains that defense counsel cross-examined only six of the state's witnesses at trial, nothing indicates that this decision was anything other than strategy or that it was in any way connected to the incident that occurred during voir dire. Similarly, although defense counsel allege defendant's mother misinterpreted a question asked her in the penalty phase and revealed defendant was previously arrested for rape, it appears the state likely would have confronted defendant's character witnesses with this fact regardless.

Defendant alleges he did not acquiesce in the decision of defense counsel to admit guilt of second degree murder and feticide in closing. In *Florida v. Nixon*, 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004), the U.S. Supreme Court instructed:

> An attorney undoubtedly has a duty to consult with the client regarding "important decisions," including questions of overarching defense strategy. *Strickland*, 466 U.S., at 688, 104 S.Ct. 2052. That obligation, however, does not require counsel to obtain the defendant's consent to "every tactical decision." *Taylor v. Illinois*, 484 U.S. 400, 417-418, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) (an attorney has authority to manage most aspects of the defense without obtaining his client's approval). But certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate. A defendant, this Court affirmed, has "the ultimate authority" to determine "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *Wainwright v. Sykes*, 433 U.S. 72, 93, n. 1, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (Burger, C. J., concurring). Concerning those decisions, an attorney must both consult with the defendant and obtain consent to the recommended course of action.

*Nixon*, 543 U.S. at 187, 125 S.Ct. at 560. The *Nixon* court distinguished, however, between the decision to plead guilty and the decision to concede factual guilt at the close of a trial. *Nixon*, 543 U.S. at 188-89, 125 S.Ct. at 561. Therefore, the *Nixon*

court found the state court had applied the incorrect legal standard because it had failed to appreciate the realities of defending against a capital charge:

> The Florida Supreme Court's erroneous equation of Corin's concession strategy to a guilty plea led it to apply the wrong standard in determining whether counsel's performance ranked as ineffective assistance. The court first presumed deficient performance, then applied the presumption of prejudice that *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), reserved for situations in which counsel has entirely failed to function as the client's advocate. The Florida court therefore did not hold Nixon to the standard prescribed in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which would have required Nixon to show that counsel's concession strategy was unreasonable. As Florida Supreme Court Justice Lewis observed, that court's majority misunderstood *Cronic* and failed to attend to the realities of defending against a capital charge. *Nixon III*, 857 So.2d, at 180-183 (opinion concurring in result).

*Nixon*, 543 U.S. at 189-90, 125 S.Ct. at 561-62; see also *Haynes v. Cain*, 298 F.3d 375, 381 (5th Cir. 2002) (commenting that "those courts that have confronted situations in which defense counsel concedes the defendant's guilty for only lesser-included offenses have consistently found these partial concessions to be tactical decisions, and not a denial of the right to counsel. As such, they have analyzed them under the two-part *Strickland* test.").

In this case, defendant has not presented a claim of ineffective assistance of counsel under *Strickland* at this juncture. Thus far, he has shown no per se violation of the Sixth Amendment resulting from an actual conflict of interest. Therefore, any potential conflict of interest or associated ineffective assistance of counsel claims that may arise are deferred for collateral review. [43]

***Right to Be Present During Rebuttal in Guilt Phase***

Defendant, who was removed from court when he became disruptive at the request of defense counsel, contends he was denied the right to be present during

---

[43] The *Nixon* court noted that the record in that case established defense counsel attempted to inform his client of the strategy but defendant was "unresponsive". *Nixon*, 543 U.S. at 189, 192, 125 S.Ct. at 561, 563. In contrast, defendant here alleges he was never informed by counsel of the intended strategy.

the state's rebuttal argument in the guilt phase. He argues that his presence at his capital trial cannot be waived by counsel.

One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial. *Lewis v. United States*, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892). Nonetheless, defendants who engage in disruptive conduct may be removed from the courtroom under certain circumstances. See generally *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). As previously mentioned, during the state's rebuttal argument in the guilt phase, defense counsel requested that defendant be removed to stem his disruptive behavior and counsel clarified that this was at defendant's own request. Defendant disputes that he wished to be removed and complains that the trial court did not engage in a colloquy to determine that his request was knowingly and voluntarily made. Regardless, assuming the trial court erred in not first warning defendant under *Illinois v. Allen* or in not inquiring further into the validity of the waiver asserted by defense counsel, a violation of defendant's right to be present at all stages of trial may constitute harmless error if a reviewing court determines beyond a reasonable doubt that the error did not influence the verdict. See *Rushen v. Spain*, 464 U.S. 114, 117-19 & n.2, 104 S.Ct. 453, 455-56, 78 L.Ed.2d 267 (1983). Based upon our review of the record in this case, we conclude defendant's absence during the final moments of the state's rebuttal was harmless.

**Penalty Phase Claims**

*Prosecutorial Misconduct*

Defendant complains the state engaged in misconduct when it cross-examined defense witnesses during the penalty phase by assuming facts not in evidence, misstating what the witnesses said, bullying the witnesses, and alleging

prior bad acts by defendant without first providing notice. He alleges the state fabricated an incident in which he shot a BB gun at his mother's abusive boyfriend and repeatedly questioned witnesses about it.[44]

Defendant complains the state cross-examined defense witnesses about his juvenile arrest, his school disciplinary record, his failure to support his son, and his guilty plea to misdemeanor carnal knowledge for having consensual sex with a 14-year-old when he was 17. Defendant alleges he was arrested at age 11 after he accidentally shot a 12-year-old neighbor with a BB gun and the state cross-examined several witnesses about this incident despite giving notice to the defense that the state was not planning to introduce this evidence in its case-in-chief. Defendant contends witnesses incorrectly recalled that he was 13 years old at the time of this incident, and argues the prosecutor engaged in misconduct by using this incorrect information in argument despite the prosecutor's knowledge of his correct age from the police report. Defendant moved for a new trial based on what he characterized as newly discovered evidence indicating the victim was uninjured in this incident.[45] Defendant argues every school infraction and his struggles as a young father are not "bad acts" suitable for consideration in the penalty phase of a capital trial. Defendant also argues the state repeatedly misrepresented the incident that led to his guilty plea to misdemeanor carnal knowledge as a rape.

Defendant contends that the state's cross-examination in all of these areas as

---

[44] Although the testimony about this incident was vague and not necessarily indicative of any misconduct by defendant, there is no basis to conclude the state fabricated it. Defendant's mother recalled an incident in which the police were called to her home regarding a report that Chad Lewis had been shot with a BB gun. She denied defendant was the shooter but instead blamed a neighbor. Other witnesses did not recall this incident. After those witnesses indicated they were unfamiliar with the incident, the state ceased further questioning regarding it. Regardless, the defense did not object when the state inquired into this matter on cross.

[45] The fact that the victim's injury was trivial was presented to the jury through the testimony of defendant's mother. The fact that the defense subsequently obtained additional evidence showing the injury was trivial does not satisfy the standard of La. C.Cr.P. art. 851(3), which requires: "New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty."

well as on the details of the crime was not responsive to the witness's testimony on direct and outside of the proper scope of cross as well as outside of the witness's personal knowledge. He further contends that, because the state gave no notice that it would elicit information about his juvenile arrest, his school disciplinary record, his lack of support of his son, and his prior guilty plea to misdemeanor carnal knowledge, he was unable to rebut the state's misleading and inaccurate depiction of him during the penalty phase. Thus, defendant argues the trial court should have conducted an evidentiary hearing on his motion for new trial in which he could have fully rebutted the state's presentation.

At the penalty phase of a capital trial, the character and propensities of the defendant are at issue. *State v. Jackson*, 608 So.2d 949 (La. 1992); *State v. Brooks*, 541 So.2d 801, 808 (La. 1989). As this Court stated in *Jackson*, 608 So.2d at 953, "the usual prohibition against the prosecution's initiation of the inquiry into defendant's character is simply not applicable in the penalty phase, where the focus on character is one of the statutory means of channeling the jury's sentencing discretion." Furthermore, as this Court emphasized in *State v. Sepulvado*, 93-2692, p. 10 (La. 4/8/96), 672 So.2d 158, 166, "[c]learly if the defense intends to develop a certain view of the defendant's background, the state should be allowed to elicit information to contradict these assertions." Thus, "neither law nor justice permits a defendant to foist a spurious reputation upon a jury because the State is so limited in its cross-examination of the character witnesses." *State v. Banks*, 307 So.2d 594, 599 (La. 1975).

A review of the record shows that the state's cross-examination was an acceptable response to the assertions of the defense's character witnesses. Defense witnesses testified that defendant planned to attend college on a football scholarship, he cared for his son and treated him well, he also treated other

children well, defendant was only involved in typical teenage problems at school, he loved animals and football, he was always helpful, he is easy-going with a good sense of humor, he had been employed caring for horses, he attended Vacation Bible School, he participated in a youth program called the Buffalo Soldiers, and he would stand up for children who were being bullied. That defendant was repeatedly suspended from school, frequently involved in fights, misused a BB gun, pleaded guilty to misdemeanor carnal knowledge of a juvenile after the victim reported she was raped, and inadequately supported his son and the mother of his child, were fair areas of inquiry to allow the state to respond to the depiction of defendant's character and propensities presented by the defense.

Furthermore, the defense did not object to these lines of questioning by the state during cross-examination. Therefore, any complaint about them is waived. La. C.Cr.P. art. 841; *State v. Wessinger*, 98-1234, p. 20 (La. 5/28/99), 736 So.2d 162, 180-81 (reviving the contemporaneous objection rule for the penalty phase as well as guilt phase of a capital trial). The defense objected to the badgering of a defense witness Kalen Washington. The transcript clearly evidences the state's frustration with Washington's meandering and evasive answers. However, the trial court did not err in finding the state's questioning formed no basis for granting the drastic remedy of a mistrial. See generally *State v. Tribbet*, 415 So.2d 182, 186 (La. 1982) (mistrial is drastic remedy and, except when mandatory, is warranted only when trial error results in substantial prejudice to defendant depriving him of reasonable expectation of fair trial).

**Miscellaneous Claims**

*Confederate Flag*

Defendant complains that he was convicted and sentenced to death in a courthouse in front of which flew a Confederate flag. Defendant contends the flag

and its close association with lynching and slavery intimidates African-American jurors and predisposes white jurors to impose the death penalty. Defendant alleges that over half of African-Americans were removed during voir dire based on their opposition to the death penalty, and defendant argues that the presence of the flag prompted their views, making it possible to exclude them from the jury.[46] According to defendant, the flag was used to systematically remove African-Americans from the jury. He argues the trial court erred in denying his motion for new trial on this basis without conducting an evidentiary hearing.

This Court faced a similar claim in *State v. Dorsey*, 10-0216 (La. 9/7/11), 74 So.3d 603. See *id.*, 10-0216 at 46, 74 So.3d at 635 ("[D]efendant contends the presence of a confederate flag memorial outside of the courthouse in Caddo Parish injects an arbitrary factor−race−into the capital sentencing decision."). In *Dorsey*, the Court discussed *McCleskey v. Kemp*, 418 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) and recognized that to establish a violation of the Equal Protection Clause, a defendant must prove, as *McCleskey* underscored, "the existence of purposeful discrimination," and "that the purposeful discrimination 'had a discriminatory effect' on him." *McCleskey*, 481 U.S. at 292, 107 S. Ct. at 1767 (citing *Whitus v. Georgia*, 385 U.S. 545, 550, 87 S.Ct. 643, 646, 17 L.Ed.2d 599 (1967) and *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985)). Discriminatory purpose "implies the decision maker selected or reaffirmed a particular course of action at least partly because of, not merely in spite of, its adverse effects on an identifiable group." *Dorsey*, 10-0216 at 50, 74 So.3d at 637 (internal quotation marks omitted). Measured against the *McClesky* standard, the Court concluded that Dorsey's claim of endemic racial discrimination did not provide any basis for setting aside either his conviction or sentence:

---

[46] As mentioned previously, the defense objected to only five of the state's cause challenges and, despite having the opportunity, it made no effort to rehabilitate the prospective jurors challenged by the state for their views on the death penalty.

> [E]ven conceding Caddo Parish placed the confederate memorial outside the district courthouse at the turn of the century, refurbishing and reaffirming it half a century later with the confederate battle flag, defendant has made no showing the parish currently maintains the memorial because of the adverse effect it would have on the administration of the criminal justice system with respect to black defendants. Defendant also failed to show the memorial creates an environment giving rise to a constitutionally significant and unacceptable risk that one or more of the jurors in his case acted with discriminatory intent in returning his or her verdict, particularly at the sentencing stage of the proceedings on the basis of his color and not on the moral culpability of his acts and his individual character.

*Dorsey*, 10-0216 at 50, 74 So.3d at 638. Defendant here fails to show purposeful discrimination and the state's success in challenging jurors with scruples against capital punishment is attributable to the strategy chosen by the defense.

### *Batson Challenge in Motion for New Trial*

Defendant contends the trial court erred in finding he could not assert a *Batson* challenge in a motion for new trial. He claims the state used peremptory challenges to remove four of nine African-American prospective jurors and there was no apparent race-neutral reason for removing Rachel Foreman, who defendant contends expressed similar views to other prospective jurors who were not challenged.

The U.S. Supreme Court has never defined timeliness for a *Batson* claim. In *Ford v. Georgia*, 498 U.S. 411, 423, 111 S.Ct. 850, 857, 112 L.Ed.2d 935 (1991), the Court found that states retain considerable discretion to fashion their own rules governing timeliness. *Id.* ("[A] state court may adopt a general rule that a *Batson* claim is untimely if it is raised for the first time on appeal, or after the jury is sworn, or before its members are selected."). Nonetheless, the Court's discussion in *Batson* makes clear that it envisioned an objection raised during the jury selection process. The *Batson* court stated that it would leave it to trial courts to determine "whether it is more appropriate . . . upon a finding of discrimination . . . to discharge the venire and select a new jury from a panel not previously

associated with the case . . . or to disallow the discriminatory challenges and resume selection with the improperly challenged jurors reinstated on the venire." *Batson*, 476 U.S. at 99 n.24, 106 S.Ct. at 1725 n.24 (citations omitted). The latter option would not exist once the jury had been sworn and the evidentiary trial had started. See *Jones v. Butler*, 864 F.2d 348, 370 (5th Cir. 1988) (on petition for rehearing) ("The Supreme Court's analysis in *Batson* presumed that an objection would be made promptly, probably before the venire was dismissed."), *cert. denied*, 490 U.S. 1075, 109 S.Ct. 2090, 104 L.Ed.2d 653 (1989).

Every federal circuit to address the issue thus far has determined that a *Batson* claim is waived if not raised during jury selection. See *Morning v. Zapata Protein (USA), Inc.*, 128 F.3d 213, 216 (4th Cir. 1997) (finding that "a *Batson* challenge raised after the venire has been excused has been raised too late"); *McCrory v. Henderson*, 82 F.3d 1243, 1246-49 (2d Cir. 1996) (finding *Batson* challenges are waived if not raised during jury selection); *United States v. Forbes*, 816 F.2d 1006, 1011 (5th Cir. 1987) (finding that "[n]ow it is too late for appellants to insist on an explanation they did not request at trial"); *Government of the Virgin Islands v. Forte*, 806 F.2d 73, 75-76 (3rd Cir. 1986) (finding defendant "waived his objection to the prosecutor's use of her peremptory challenges by failing to make a contemporaneous objection during jury selection"); see also *United States v. Dobynes*, 905 F.2d 1192, 1196-97 (8th Cir.) (finding that a defendant who raised a *Batson* claim for the first time one week after the conclusion of the trial had forfeited the objection), *cert. denied*, 498 U.S. 877, 111 S.Ct. 206, 112 L.Ed.2d 167 (1990); cf. *United States v. Tomlinson*, 764 F.3d 535, 536 (6th Cir. 2014) (finding a *Batson* claim not waived because it was asserted before the jury was sworn and trial commenced).

Three state supreme courts which held, prior to *Batson,* that a prosecutor's

use of peremptory challenges on the basis of race violated provisions of their state constitutions all appear to have recognized that such an objection must be raised during jury selection when it can easily be remedied. See *State v. Neil*, 457 So.2d 481, 486 & n.9 (Fla. 1984); *Commonwealth v. Soares*, 377 Mass. 461, 491, 387 N.E.2d 499, 517-18, *cert. denied*, 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979); *People v. Wheeler*, 22 Cal.3d 258, 263, 280, 282, 148 Cal. Rptr. 890, 583 P.2d 748, 752, 764, 765 (1978). Subsequently, state appellate courts have determined that a *Batson* challenge must be asserted before the jury is sworn,[47] and a *Batson* claim is waived if not asserted until after the verdict.[48]

Thus, the overwhelming weight of authority is contrary to defendant's position that a *Batson* challenge asserted for the first time in a motion for new trial post-verdict is timely. Defendant's reliance on *Alex v. Rayne Concrete Service*, 05-1457 (La. 1/26/07), 951 So.2d 138, is misplaced. That decision did not address the question of timeliness and waiver at all; it resolved "a split among the court of appeal regarding whether a *Batson/Edmonson* challenge in a civil trial must be taken to the appellate court by supervisory writ or whether it may be considered on appeal following the conclusion of the trial". *Alex*, 05-1457 at 1, 951 So.2d at 141. Plaintiff in that case did not wait until after obtaining an unfavorable verdict but rather asserted his *Batson* challenge at the end of jury selection. See *id*., 05-1457 at 2, 951 So.2d at 142. This Court did state "in light of the United States Supreme Court's decision in *Miller-El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005), that a defendant may rely on 'all relevant circumstances' to raise an inference of purposeful discrimination under *Batson*, and not just the reasons proffered by the State in making the peremptory challenge, it seems reasonable, if

---

[47] See *State v. Parrish*, 327 Mont. 88, 92, 111 P.3d 671, 674 (Mt. 2005); *State v. Rodriguez*, 6 Neb. App. 67, 76, 569 N.W.2d 686, 692 (Neb. App. 1997); see also *Stegall v. State*, 628 So.2d 1006, 1009 (Ala. Crim. App. 1993) (stating that "whether the appellant's *Batson* objection was untimely is governed by whether the remaining venire members had been released").

[48] *Philmon v. Baum*, 865 S.W.2d 771, 775 (Mo. App. 1993).

49

not necessary in some circumstances, for a party to wait until after the entire trial is over to seek review of the peremptory challenge." *Alex*, 05-1457 at 9, 951 So.2d at 146. That comment, however, explicitly refers only to the necessity of seeking "review" and cannot reasonably be read as relieving a party from the necessity of timely objecting. This claim is without merit.

*Newly Discovered Evidence*

Defendant contends he presented newly discovered evidence that he was not the shooter and the victim's mother forgave him. The evidence that he was not the shooter consists of an anonymous letter. Defendant argues this mitigation evidence would have swayed at least one juror and the trial court erred in denying the motion without conducting an evidentiary hearing.

This Court has repeatedly noted that in order to obtain a new trial based on "newly discovered evidence," the defendant has the burden of showing that "(1) the new evidence was discovered after trial, (2) the failure to discover the evidence at the time of the trial was not caused by lack of diligence, (3) the evidence is material to the issues at trial, and (4) the evidence is of such a nature that it would probably have produced a different verdict." *State v. Hammons*, 597 So.2d 990, 994 (La. 1992); *State v. Knapper*, 555 So.2d 1335, 1339 (La. 1990); *State v. Prudholm*, 446 So.2d 729, 735 (La. 1984); *State v. Talbot*, 408 So.2d 861, 884 (La. 1980). An anonymous letter of unknown provenance that lacks any indicia of reliability is not material. Cf. *United States v. Garner*, 940 F.2d 663 (6th Cir. 1991) (commenting that it was "highly unlikely" that an anonymous letter would be admitted at trial); *cf. also Rainer v. State*, 566 N.W.2d 692, 695 (Minn. 1997) (describing an anonymous letter as "uncorroborated and unreliable"); *State v. Potter*, 148 Vt. 53, 64, 529 A.2d 163, 169-70 (1987) (finding an anonymous letter "would not provide reasonable assurance of a different result, primarily because it

raised problems of authentication and hearsay and would not be admissible on retrial").

The fact that the victim's mother in this case has found some measure of peace after sentencing is not newly discovered material evidence providing a ground for a new trial under La. C.Cr.P. art. 851(3). Defendant's assignment of error is without merit.

### *Diminished Capacity*

Defendant contends a death sentence cannot be imposed because he was barely over the age of 18 and his IQ is 74. Because of his diminished mental capacity, defendant argues his maturity level is less than his chronological age and therefore a death sentence constitutes cruel and unusual punishment.

In *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), the U.S. Supreme Court held that "the death penalty cannot be imposed upon juvenile offenders, 543 U.S. at 575, 125 S.Ct. at 1198, and the court further drew the line between juvenile and adult offenders at age 18, 543 U.S. at 574, 125 S.Ct. at 1197. Defendant here was over 18 years of age when he murdered Tavia Sills. Nonetheless, he claims that because of his immaturity there is little practical difference between himself and an offender who commits murder before reaching the age of 18 years. However, the Supreme Court drew the line at age 18 well aware of the "objections always raised against categorical rules," *id.*, 543 U.S. at 574, 125 S.Ct. at 1197, driven by two rationales: there was "objective indicia of consensus" against sentencing juvenile offenders to death in that, for example, most States had already rejected that possibility; and the death penalty "is a disproportionate punishment" because juvenile offenders as a class are less culpable than adult offenders. *Id.*, 543 U.S. at 563-69, 125 S.Ct. 1191-95. No similar consensus exists against executing adult offenders and, although defendant

therefore cannot benefit from the categorical prohibition of *Roper v. Simmons*, he had the opportunity to present his immaturity to the jury in the penalty phase as a mitigating circumstance. See *United States v. Mitchell*, 502 F.3d 931, 981 (9th Cir. 2007) (finding that it "may well be true that [defendant] is less mature than the average 20 year old. But whether true or not, and whether that mitigates against his crime, is a question the Constitution permits to be answered on a case-by-case basis.").

In *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the U.S. Supreme Court determined that the Eighth Amendment "'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." *Atkins*, 536 U.S. at 321, 122 S.Ct. at 2252 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 106 S.Ct. 2595, 2599, 91 L.Ed.2d 335 (1986)). The present defendant did not attempt to prove that he should have the benefit of that categorical prohibition by following the procedure provided by La. C.Cr.P. art. 905.5.1, which was enacted to effectuate the mandate of *Atkins*. He simply submitted Dr. Vigen's expert opinion that he has a full scale IQ of 74[49] in conjunction with a post-verdict motion. As previously mentioned, defendant did not present that expert's opinion to the jury in the penalty phase.

Defendant, in essence, argues that his two near misses at qualifying for the categorical prohibitions established in *Roper v. Simmons* and *Atkins v. Virginia*, when viewed together, should qualify him for a new categorical prohibition under the Eighth Amendment, as yet unestablished by the U.S. Supreme Court, against executing those who are less culpable because of their immaturity in conjunction with their below average intelligence. As noted above, those considerations are

---

[49] In *Hall v. Florida*, ___ U.S. ___, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014), the U.S. Supreme Court determined that the Florida Supreme Court's interpretation of a Florida statute as barring a defendant from presenting a claim that he cannot be executed because of his intellectual disability when he has an IQ score above 70 is unconstitutional because it fails to consider the margin of error.

indeed mitigating circumstances that are relevant to the jury's determination in the penalty phase. But defendant's argument by post-verdict motion and on appeal that he is less culpable for these reasons is not sufficient to override the jury's determination that death was the appropriate penalty in this instance. This claim is without merit.

### Endemic racism in Caddo Parish

Defendant contends that his sentence violates the Eighth Amendment because he is an African-American man who was prosecuted in Caddo Parish, which made it more likely that he would receive a death sentence than if he had been prosecuted elsewhere.

In *Dorsey*, 10-0216 at 51, 74 So.3d at 638, this Court found defendant did not first present his claim to the trial court that racism pervades Caddo Parish and that race and parish together are the best predictors of who will face a capital prosecution. In the present case, defendant argued in support of his motion to prevent the flying of the Confederate flag that the death penalty is disproportionately applied to black offenders who kill white victims and that African-Americans represent about 20% of the population of Caddo Parish while about 78% of those tried for first degree murder in Caddo Parish are African-Americans. That, however, is not the same argument defendant asserts for the first time on appeal, *i.e.*, black males are more likely to be convicted of first degree murder and sentenced to death in Caddo Parish than any other jurisdiction as a result of endemic racism. Regardless, assuming arguendo, that defendant's motion placed this claim before the trial court, the only support offered by defendant is a study showing that six death sentences were imposed in Caddo Parish between 2004 and 2009, compared to four in East Baton Rouge, two in Ouachita, two in Jefferson, one each in Red River, West Baton Rouge, St. Tammany, Livingston,

Calcasieu, and St. Mary parishes. Robert J. Smith, *The Geography of the Death Penalty and Its Ramifications*, 92 B.U.L. Rev. 227, 281-89 (2012). That is not sufficient to prove the death penalty is disproportionately applied against African-American men in Caddo Parish because of endemic racism. Defendant's claim is without merit.

## CAPITAL SENTENCE REVIEW

In the discharge of the duty imposed by the legislature to "review every sentence of death to determine if it is excessive," La. C.Cr.P. art. 905.9, this Court will review the record in a capital case to determine: (1) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors; (2) whether the evidence supports the jury's finding of a statutory aggravating circumstance; and (3) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. La. S.Ct. Rule 28, § 1. In the present case, Rule 28 review demonstrates that defendant's death sentence is not excessive.

### *Passion, Prejudice, or Other Arbitrary Factors*

There are very few potential sources of passion, prejudice, or other arbitrary factors in the present case, aside from the allegation that racism pervades Caddo Parish, which factor the defendant contends is the best predictor of who will receive a death sentence in Louisiana. As discussed above, however, the defendant did not present that claim to the district court where the necessary factual development could occur, and the claim rests on speculation, unsupported allegations, and the fact that Caddo Parish has imposed just two more death sentences than the parish that has imposed the next greatest number (the statistical significance of which is unknown). Defendant also argues that he is likely ineligible for a death sentence under *Atkins v. Virginia*, *supra*. As noted above,

defendant has not presented this claim following the procedure outlined in La. C.Cr.P. art. 905.5.1 and did not even present Dr. Vigen's opinion regarding his mental functioning to the jury in the penalty phase. The record does not reveal any potential indicia of passion, prejudice, or arbitrariness. Defendant, an 18-year-old black male, killed his pregnant girlfriend and received a sentence of death from a jury consisting of eight white females, two black females, and two white males, during the selection of which no *Batson* challenge was asserted. Although the defendant attributes the verdict to racism, the defendant's allegations in this regard are unproved.

### *Aggravating Circumstances*

As demonstrated by the jury's verdict during the guilt phase of the trial, the state presented sufficient evidence to prove beyond a reasonable doubt that defendant killed the victim while engaged in the perpetration of a second degree kidnapping, and when the offender knowingly created a risk of death or great bodily harm to more than one person. A review of the record suggests that the evidence was sufficient to support such a determination. Defendant was the last person seen with the victim. Defendant confessed to the crime and took police to the location where the murder weapon could be found. A witness saw defendant and the frightened victim as they walked to the location where the victim's body was later found and the witness heard gunshots. Although the defendant initially claimed he dropped the victim off at her sister's apartment, surveillance video contradicted this claim. Defendant ultimately claimed he shot the victim accidentally, and admitted he then shot her a final time to make certain that she was dead rather than seeking help.

As discussed above, the state's evidence overwhelmingly proved defendant committed the crime of second degree kidnapping when he enticed/persuaded

Tavia Sills to accompany him from one place to another and into the woods, for purposes of facilitating the commission of another felony (her murder) by means of the firearm in his possession, thereby causing her physical harm (death). The jurors found this aggravating circumstance proved beyond a reasonable doubt in the penalty phase of the trial. Therefore, even if the jury's additional finding that defendant knowingly created a risk of death or great bodily harm to more than one person is erroneous because Tavia Sill's unborn child is not a person for purposes of La. C.Cr.P. art. 905.4(A)(4), that error does not require reversal of the penalty phase verdict because it did not introduce an arbitrary factor into the proceedings. See *State v. Welcome*, 458 So.2d 1235, 1245 (La. 1983) ("This court has taken the position that where more than one statutory aggravating circumstance is found by the jury, the failure of the one circumstance does not so taint the proceedings as to invalidate any other aggravating circumstance found and the sentence of death based thereon."); see also *State v. Thibodeaux*, 98-1673, p. 15 (La. 9/8/99), 750 So.2d 916, 928 (In the context of Rule 28 review, the existence of an arbitrary factor requires this court to find an error of such magnitude that it undermines confidence in the jury's sentencing verdict, . . . ."). Evidence that Tavia Sills was pregnant inevitably would have come before jurors to provide them with defendant's motive for an otherwise an unexplained murder, *i.e.* that he killed her to protect his relationship with Tamara Bates, the mother of his three-year-old son. See *State v. Williams*, 93-2707 (La. 3/11/94), 633 So.2d 147, 149 ("Motive is not an essential element of murder, but a lack of motive may properly be considered as a circumstance mitigating against specific intent.") (internal quotation marks and citation omitted).

### *Proportionality*

The federal Constitution does not require a proportionality review. *Pulley v.*

*Harris*, 465 U.S. 37, 42-50, 104 S.Ct. 871, 875-79 (1984). However, comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana, *State v. Burrell*, 561 So.2d 692, 699-700 (La. 1990); *State v. Wille*, 559 So.2d 1321, 1341-42 (La. 1990); *State v. Thompson*, 516 So.2d 349, 356-57 (La. 1987), although the Court has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case, *inter alia*, a sufficiently "large number of persuasive mitigating factors." *State v. Sonnier*, 380 So.2d 1, 9 (La. 1979); see also *State v. Weiland*, 505 So.2d 702, 707-10 (La. 1987) (in case reversed on other grounds, dictum suggesting that death penalty disproportionate).

The Uniform Capital Sentence Report reveals that defendant is a black male born on April 3, 1990. He was 18 years old at the time of the offense and is now almost 25 years old. He is unmarried and has one child (now approximately 10 years old). He completed the 11th grade. He has no significant employment history and previously pleaded guilty to misdemeanor carnal knowledge of a juvenile. He was frequently suspended from school.

According to the state, since 1976, 46 persons (excluding defendant) have been indicted for first degree murder in Caddo Parish, of which 18 have been found to merit a sentence of death by a jury.[50] Of death sentences not reversed, two were committed during kidnappings, eight involved intent to kill more than one person, and seven involved female victims.

A review of the capital verdicts from Caddo Parish does not suggest that Lamondre Tucker received a disproportionately harsh sentence. As noted above, two cases resulted in a death sentence when the perpetration of a kidnapping was an aggravating circumstance. In *Dorsey*, 10-0216, 74 So.3d 603, defendant and a

---

[50] Defendant disputes the state's numbers and alleges that there have been at least 313 first degree murder cases in Caddo Parish that have not result in a death sentence and that are relevant to the issue of proportionality.

codefendant were interrupted while committing a home invasion/armed robbery by the return of the male victim. The two subdued the victim, demanded money, and then defendant pistol-whipped the victim before setting him on fire. In *State v. Wilson*, 03-1229 (La. 3/30/05), 899 So.2d 551, defendant and codefendants abducted the female victim. Defendant repeatedly raped the victim before shooting her in the head and leaving her body by the roadside. Although defendant Tucker engaged in less brutality than that exhibited by Dorsey or Wilson, the present case is not out of place when viewed in proper context. Tucker, through guile, abducted his pregnant girlfriend and lured her to a secluded location where he could kill her. He shot her twice, he apparently planned or attempted to set her on fire, and then shot her a third time to be certain that she was dead. With the help of an accomplice, Tucker used a large branch to push her body out into the pond in an attempt to hide the evidence. He then discarded the murder weapon in a drainage canal and tried to enlist the aid of friends in concealing his involvement in the crime.

In view of the foregoing, the proportionality review does not give the Court undue pause. The death penalty imposed on the defendant, Lamondre Tucker, for the first degree murder of Tavia Sills is not disproportionate.

## DECREE

For the reasons assigned herein, the defendant's conviction and death sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial

58

judge shall, upon receiving notice from this Court under La. C.Cr.P. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana Public Defender Board and provide the Board with reasonable time in which:  (1) to enroll counsel to represent the defendant in any state post conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:178; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.

**AFFIRMED**